Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SALEEM ERAKAT

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SALEEM ERAKAT, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>HOBBY LOBBY STORES, INC., an Oklahoma corporation,<br><br>Defendants. | Case No: 4:26-cv-00323-HSG<br><br>Hon. Haywood S. Gilliam, Jr.<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1) 18 U.S.C. § 2511<br>2) Cal. Penal Code § 631<br>3) Cal. Penal Code § 638.51<br>4) Cal. Constitution Art. I § 1<br>5) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>6) Intrusion Upon Seclusion<br>7) Unjust Enrichment |

Plaintiff SALEEM ERAKAT ("Plaintiff") files this first amended class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant HOBBY LOBBY STORES, INC., an Oklahoma corporation ("Defendant" or "HOBBY LOBBY"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.hobbylobby.com (the "Website"), a website that Defendant owns and/or operates.

2. Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3. To achieve these goals, Defendant enables third-party technologies on its Website that perform two distinct categories of unlawful surveillance:

- First, these technologies intercept the contents of users' electronic communications with the Website by capturing and transmitting to third parties the full, human-readable URLs identifying specific content the user is reading, including private religious themes and interests, along with product category data, structured event metadata describing specific user interactions. These transmissions occur in real time, are paired with persistent tracking identifiers, and are made without the knowledge or consent of the user, in violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, and the federal Wiretap Act, 18 U.S.C. § 2511.
- Second, the same technologies also function as unlawful pen registers and/or trap-and-trace devices or processes by automatically capturing and transmitting non-content dialing, routing, addressing, and signaling ("DRAS") information,

including Internet Protocol addresses, referrer headers, timestamps, session identifiers, and device or browser identifiers, to third-party servers in real time during users' interactions with the Website. Defendant deploys these technologies without judicial authorization and without obtaining Plaintiff's or Class Members' consent.

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

5. When triggered, the pixel causes the user's browser to transmit data to third-party servers. The transmitted data comprises two legally distinct categories.

6. The first category is the contents of the user's electronic communications with the Website, the substantive information generated by and reflected in the user's interaction with each page. This includes, without limitation: structured event payloads in which the third-party tracker transmits, as discrete named parameters, the specific subject matter of the user's session, such as plaintext product names, product prices, item identifiers, content category labels, content type designations, search query terms, and similar attributes extracted from the rendered page; identity-linked customer-match identifiers transmitted by the tracker as user-level identity tokens, including SHA-256-hashed email values and equivalent cross-platform identifiers; and, where transmitted as discrete named payload parameters identifying the specific substance of the page the user is viewing, full human-readable URLs of articles, blog posts, product pages, category pages, and search results pages.

7. The second category is non-content dialing, routing, addressing, and signaling information, the technical metadata generated by the act of transmission itself. This includes, without limitation: persistent and session-level cookie and storage identifiers assigned by the tracker; request timestamps and event sequencing; referrer headers (limited to the prior domain); browser, operating system, and device characteristics; screen resolution and viewport dimensions; language and locale settings;

and IP addresses, to the extent they appear only in the network-layer routing of the request and are not transmitted as named payload parameters within the tracker's application-layer payload.

8. These transmissions occur automatically upon page load and navigation, without any visible indication to the user, and before the user has any opportunity to provide or withhold consent.

9. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics, Tag Manager)
- Facebook Tracker
- Scarab Research Tracker
- Mountain Tracker
- Pinterest Tracker

10. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

11. The Trackers are operated by distinct third parties, including Google LLC (as to the Google Trackers, which include Google Tag Manager and Google Analytics), Meta Platforms, Inc. (as to the Facebook Tracker), ScarabResearch, Inc. (as to the Scarab Research Tracker), MNTN, Inc. (as to the Mountain Tracker, which operates from the px.mountain.com, dx.mountain.com, and gs.mountain.com endpoints), and Pinterest, Inc. (as to the Pinterest Tracker, which operates from the ct.pinterest.com endpoint) (collectively, the "Third Parties"). Defendant knowingly enables, deploys, and maintains these Trackers on the Website and thereby aids, employs, agrees with, and conspires with the Third Parties to transmit user data from users' browsers to third-party servers.

The Google, Facebook, Scarab, Mountain and Pinterest Trackers are referred to herein as the "Trackers."

12. Because the Trackers capture and transmit users' referrer headers, session-level and persistent identifiers, timestamps and event sequencing, browser and device characteristics, and other categories of non-content dialing, routing, addressing, and signaling information, the Trackers function, as to such non-content information, as 'pen registers' and/or 'trap and trace devices' within the meaning of Cal. Penal Code § 638.50. These technologies silently collect such information for commercial purposes without the user's knowledge, consent, or interaction.

13. Through the Trackers, Defendant also causes the Third Parties operating those Trackers to intercept and acquire the contents of users' electronic communications with the Website, in real time and contemporaneously with users' transmission of those communications, and without users' knowledge or consent. The contents intercepted and acquired include the following:

a. With respect to the Google Trackers, the substantive content of users' search queries (transmitted to Google as the discrete named parameter ep.search_term containing terms entered by the user, including for example "jesus" and "jesus saves"); event identifiers describing users' specific interactions with content (such as view_item events transmitted on product-page views and page_view events transmitted on every page load); the price of products users view (transmitted as the named parameter epn.value); and the page title of each page users view (transmitted as the named parameter dt, including titles such as "Jesus Walking On Water Framed Canvas Wall Decor | Hobby Lobby | 2435634").

b. With respect to the Facebook Tracker, the page title of each page users view (transmitted as the named parameter pmd[title]); the full plaintext description of each product users view, extracted from the rendered page (transmitted as the named parameter pmd[description], including descriptions such as "Display a reminder of who Jesus is in your living room with the gorgeous Jesus Walking On

Water Framed Canvas Wall Decor. This profound art piece features an image of Jesus, hands outstretched, walking on water with a lovely sunrise in the background"); and structured product-content data including product identifiers, names, descriptions, ratings, and item conditions (transmitted via multipart-form POST bodies on PageView events).

c. With respect to the Scarab Research Tracker, the URL of each previously viewed page in the user's session (transmitted as the named parameter prev_url), including the substantive content of any search query the user has entered (e.g., URLs such as search?query=jesus and search?query=jesus%20saves).

d. With respect to the Mountain Tracker, the plaintext product name and product price of the specific item being viewed by the user (transmitted to MNTN, Inc. as the named payload parameters shpn and shpp), together with the URL of the product page being viewed (transmitted as the parameter plh), the product slug (transmitted as shps), the product image URL (transmitted as shpi), and the full plaintext meta-description of the product extracted from the rendered page (transmitted within structured meta_tag_data as the field description.content).

e. With respect to the Pinterest Tracker, a SHA-256-hashed customer-match identifier of the kind Pinterest's "enhanced match" infrastructure uses for cross-platform user identification (transmitted to Pinterest, Inc. as the field em within a JSON-encoded payload), paired with the full URL of the page or search-results page being viewed by the user (transmitted as the field loc within a separate JSON-encoded payload), including the substantive content of any search query the user has entered.

14. As configured by Defendant, these contents are transmitted automatically upon page load and navigation, before any consent mechanism can be exercised, and as part of the same browsing transaction by which the user communicates with the Website. The Third Parties operating the Trackers use the intercepted contents for their own independent commercial purposes, including identity resolution, customer matching,

behavioral profiling, recommender optimization, and audience-based advertising, from which they and Defendant each derive separate commercial benefit.

15. Because the Trackers capture, acquire, and transmit to the Third Parties the substantive contents of users' electronic communications with the Website and do so contemporaneously with those communications by means of software code embedded by Defendant in the Website, the Trackers function, as to such communication contents, as instruments of unauthorized interception of the contents of electronic communications within the meaning of California Penal Code § 631 and 18 U.S.C. § 2511. These technologies do not collect mere addressing or signaling metadata generated by the act of transmission; they capture the substance, purport, and meaning of the communications themselves, and transmit that substance to third parties for use in identity resolution, customer matching, and audience profiling.

16. The invasiveness of Defendant's conduct is compounded by the nature of the Third Parties operating the Trackers and receiving Plaintiff's and Class Members' communications and interaction data. These entities operate large-scale analytics, advertising, recommender, and identity-resolution platforms that are designed to combine information collected from the Website including both the contents of users' communications with the Website and the non-content dialing, routing, addressing, and signaling information generated in the course of those communications with information collected from users' interactions on other websites and applications. By aggregating these data sources, the Third Parties add Website-derived information to persistent cross-site user profiles capable of identifying or re-identifying the same user, browser, or device across multiple sessions, devices, and contexts. Those profiles are then used to track Plaintiff and Class Members across the Internet and are made available to advertisers and data partners for purposes including targeted advertising, advertising measurement, identity resolution, cross-device tracking, and audience segmentation based on users' observed behaviors and inferred attributes.

/ / /

17. Plaintiff and the Class Members did not consent to the installation, execution, or operation of the Trackers on their devices and did not expect their browsing activity or routing and signaling information to be disclosed or monetized in this manner. The Website did not display any consent banner, pop-up, cookie notice, or other mechanism requesting authorization before installing or using pen-register or trap-and-trace technology. General statements in a privacy policy accessible only through non-blocking hyperlinks do not constitute express prior consent.

18. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II. PARTIES

19. Plaintiff SALEEM ERAKAT is a California citizen residing in Contra Costa County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on multiple occasions during the class period, including but not limited to on December 24, 2025. During the class period, Plaintiff used the Website to search for products, to view product pages, to view articles, and to locate the Hobby Lobby retail store closest to his primary residence using the Website's find a store feature. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

20. HOBBY LOBBY STORES, INC. is an Oklahoma corporation that owns, operates, and/or controls the Website, which is an online platform offering arts, crafts, home décor, seasonal items, and related retail goods to consumers, including the ability to browse products, view detailed product information, and make purchases through a web-based interface.

21. HOBBY LOBBY operates a nationwide retail enterprise specializing in arts, crafts, home décor, and related merchandise through a network of brick-and-mortar stores and its Website. The Website serves as a central channel for product discovery, consumer engagement, and promotion of HOBBY LOBBY's retail offerings.

/ / /

22. HOBBY LOBBY's nationwide retail operations include a substantial brick-and-mortar presence in California. On information and belief, Defendant owns and operates more than fifty (50) retail stores in California, employs California residents at those stores, and serves California consumers in person. California is a material commercial market for HOBBY LOBBY's retail business, and HOBBY LOBBY derives substantial revenue from California consumers, both through its California retail stores and through online sales fulfilled to California addresses.

23. HOBBY LOBBY's Website is deliberately integrated with, and operates as a channel into, HOBBY LOBBY's California retail operations. The Website incorporates a store-locator function identifying HOBBY LOBBY's California retail locations to users; calculates shipping and applies sales tax based on California-specific delivery and tax logic for orders directed to California addresses; and otherwise solicits, encourages, and converts California consumers into California-store transactions and California-fulfilled online purchases.

24. HOBBY LOBBY employs thousands of individuals across its retail, merchandising, distribution, technology, marketing, and corporate operations, including in California. Its business includes a substantial emphasis on consumer-facing digital platforms, online product presentation, and data-driven marketing and analytics practices that collectively support sales and drive in-store customer engagement.

25. HOBBY LOBBY knows, actually or constructively, that a substantial portion of the Website's users and a substantial share of its online and in-store revenue derive from California residents. HOBBY LOBBY has configured the Website, including its integration of the Trackers and other digital marketing infrastructure, to identify, profile, market to, and convert that California audience, and HOBBY LOBBY's deployment of the Trackers is part of a deliberate, sustained commercial strategy of reaching, monetizing, and commercially exploiting the California consumer market through the Website.

/ / /

26. HOBBY LOBBY's deployment of the Trackers reflects sustained commercial relationships with California-headquartered advertising, analytics, and identity-resolution companies including Google LLC, headquartered in Mountain View, California; Meta Platforms, Inc., headquartered in Menlo Park, California; and Pinterest, Inc., headquartered in San Francisco, California. HOBBY LOBBY chose to integrate those companies' tracking technologies into the Website, and to maintain those integrations on an ongoing basis, as part of its deliberate engagement with a California-rooted advertising and analytics ecosystem and as part of its strategy to reach, measure, profile, and monetize the Website's users, including California users.

27. The Website is a central component of HOBBY LOBBY's digital commerce and marketing ecosystem. It allows consumers to browse product categories, search for items, view detailed product pages, and interact with HOBBY LOBBY's retail offerings online. The Website functions as a primary consumer-facing interface through which HOBBY LOBBY presents and promotes its merchandise for online and in-store purchases in California.

## III. JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

29. This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which authorizes the Court to exercise personal jurisdiction over a defendant subject to the jurisdiction of a court of general jurisdiction in California, and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of personal jurisdiction to the full extent permitted by the Due Process Clause of the United States Constitution. Defendant is subject to specific personal jurisdiction in this forum because (a) Defendant purposefully directed at

California and California residents the data-collection, tracking, and marketing conduct giving rise to Plaintiff's claims, and (b) Plaintiff's claims arise out of and relate to that California-directed conduct. The exercise of personal jurisdiction over Defendant in this forum comports with due process and traditional notions of fair play and substantial justice.

30. Defendant operates a substantial physical retail business in California consisting, on information and belief, of not fewer than fifty (50) brick-and-mortar HOBBY LOBBY stores located in California, employing California residents and selling Hobby Lobby merchandise to California consumers, and Defendant uses the Website as a central digital channel into and in support of that California retail business. Defendant's operation of the Website with respect to California is integrated with Defendant's California retail operations and is used by Defendant to reach California consumers in California.

31. Plaintiff's claims arise from a continuing course of California-located conduct by Defendant, in which Defendant's deployment of the Trackers caused the contemporaneous interception, transmission, and disclosure of Plaintiff's communications and identifying information across multiple sessions, with the resulting data assembled into a persistent cross-platform profile of Plaintiff and California Class Members. The conduct giving rise to this action consists not of any single transmission in isolation, but of the cumulative interception and exploitation of Plaintiff's California-based browsing activity over time.

32. Defendant has made an express, ongoing, and deliberate choice to integrate the Website with the Trackers for the purpose of identifying, profiling, marketing to, and monetizing the Website's users, including the substantial portion of those users that Defendant knows actually or constructively to be California residents. The deployment of the Trackers on the Website is the work of Defendant, made by Defendant's own choice and configuration; it is not a passive incident of operating a website, and it is not a contact attributable to the Trackers' operators. It is the central instrumentality of

Defendant's strategy to commercially exploit the California consumer market through the Website.

33. Plaintiff is a California resident. On multiple occasions during the class period Plaintiff accessed the Website from within California and engaged in browsing activity, including conducting product searches, reading articles, and viewing product detail pages on the Website. During each of those California-located sessions, Defendant caused Plaintiff's browser, while located in California, to transmit Plaintiff's communications and identifying information to the Third Parties operating the Trackers, including (a) non-content dialing, routing, addressing, and signaling information transmitted to the operators of the Trackers, and (b) the substantive contents of Plaintiff's communications with the Website transmitted to the operators of the Trackers, including the URL of the search-results pages Plaintiff viewed, the URL and product name of the product detail pages Plaintiff viewed, and an identifier derived from Plaintiff's session and transmitted as a customer-match value. Those transmissions occurred contemporaneously with Plaintiff's California-located use of the Website and are the conduct out of which Plaintiff's claims arise.

34. As configured by Defendant, the transmissions described above occurred automatically during page loads and navigation, in real time and contemporaneously with Plaintiff's and other California users' communications with the Website. The transmissions to the operators of the Trackers included referrer headers identifying the prior domain, session-level and persistent identifiers, timestamps and event-sequencing data, browser and device characteristics, IP-based routing information at the network layer, plaintext substantive content extracted from the pages Plaintiff and other California users viewed including product names, articles, product prices, search query strings, and page-level content URLs and identity-linked customer-match identifiers transmitted as named payload parameters.

35. The injury Plaintiff and Class Members suffer is not confined to any single intercepted transmission. The Trackers, operating in concert as a coordinated tracking

architecture, capture and transmit the contents of Plaintiff's and Class Members' communications, together with persistent identifiers, across multiple sessions, and the Third Parties combine those transmissions into persistent cross-platform user profiles capable of identifying or re-identifying Plaintiff and Class Members across sessions, devices, and contexts. The harm at issue is the cumulative and ongoing interception, profiling, and commercial exploitation of Plaintiff's and Class Members' communications and identifying information, including the loss of anonymity, the ongoing surveillance, and the commodification of the resulting behavioral dossier. This harm bears a close relationship to harms historically actionable at common law, including unauthorized wiretapping, eavesdropping, and intrusion upon seclusion.

36. Defendant's Privacy Policy admits and confirms that, when users interact with the Website, Defendant receives and stores certain types of information automatically, including *inter alia,* IP address, browsing behavior, browser and device characteristics, referring URLs, operating system information, and other information collected by third-party vendors, and that cookies and similar technologies are used to optimize and serve advertisements and to measure ad-related interactions.

37. Defendant's Privacy Policy further admits and confirms that information collected through Defendant's online services is disclosed to third-party vendors and service providers, including analytics providers and advertising-related partners, and that certain analytics and advertising cookies may constitute a sale or sharing of personal information under applicable law. These disclosures confirm Defendant's awareness that the data of users, including the data of California users, is collected, transmitted, and shared through Defendant's third-party tracking integrations as a deliberate feature of how the Website operates.

38. Defendant's privacy disclosures further confirm that Defendant knows California residents are a substantial and material portion of the Website's user base, including by addressing California-specific consumer privacy rights in those disclosures. This reflects Defendant's awareness that California residents are among the users whose

data Defendant collects, transmits, and shares through the Trackers and other third-party integrations. Plaintiff does not predicate personal jurisdiction on Defendant's compliance with California consumer-protection law as such, but cites these disclosures as Defendant's own admissions of its knowledge of, and ongoing engagement with, California users.

39. The conduct giving rise to Plaintiff's claims did not occur fortuitously, randomly, or as a result of passive internet activity. It arose from Defendant's intentional and deliberate configuration of the Website to deploy the Trackers and to cause California users' browsers, while located in California, to transmit non-content routing and signaling information and the contents of California users' communications to the Third Parties for use in Defendant's California-targeted commercial activities. Defendant thus deliberately reached out beyond its home state by knowingly installing tracking software onto unsuspecting Californians devices so that it could use and monetize the data it obtained, in a manner that was neither random, isolated, nor fortuitous.

40. Defendant thus purposefully directed its data-collection, tracking, and marketing conduct toward California and California residents, including Plaintiff; that conduct represents Defendant's own deliberate engagement with the California market for commercial gain, and not merely the consequence of California users' independent decisions to access the Website; Plaintiff's claims arise out of and relate to that California-directed conduct, specifically: the contemporaneous interception, transmission, and disclosure of Plaintiff's communications and identifying information to the operators of the Trackers during Plaintiff's California-located sessions; and the exercise of specific personal jurisdiction over Defendant in this forum is therefore proper and consistent with due process.

41. The exercise of specific personal jurisdiction over Defendant in this forum is also reasonable. California has a strong interest in adjudicating wiretapping, eavesdropping, and privacy-intrusion claims against entities that intentionally collect

and commercially exploit the data of California residents, as reflected in the California Invasion of Privacy Act, and the California Constitution. Plaintiff has a strong interest in convenient and effective relief in his home forum. Defendant has substantial physical, commercial, employment, and digital presence in California sufficient to defend this action without unfair burden. And the interstate judicial system's interest in efficient resolution, and the shared interest of states in furthering substantive social policies, are best served by adjudicating in California the claims arising from California-directed conduct affecting California residents.

42. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Plaintiff resides here with an intent to reside indefinitely; (2) Defendant regularly transacts business in this District and is subject to personal jurisdiction here; and (3) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV. GENERAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

43. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630).

44. Among the conduct CIPA prohibits, § 638.51 prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

45. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or

facility from which a wire or electronic communication is transmitted," excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

46. Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents (Cal. Penal Code § 638.50(b)).

47. In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

48. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

49. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

50. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address and the subject line, capturing the incoming information.

51. CIPA also prohibits the unauthorized interception of the contents of electronic communications. Cal. Penal Code § 631(a). Section 631(a) imposes liability on any person who, "by means of any machine, instrument, or contrivance, or in any other manner": (i) "intentionally taps, or makes any unauthorized connection … with any telegraph or telephone wire, line, cable, or instrument"; (ii) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads,

or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state"; or (iii) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." Cal. Penal Code § 631(a). Section 631(a) further imposes liability on "any person who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section." *Id.*

52. Whereas § 638.51 protects against the unauthorized capture of non-content dialing, routing, addressing, and signaling information generated by the act of communication, § 631(a) protects against the unauthorized interception of the contents of communications themselves; that is, the substance, purport, and meaning of the communication, including the substantive information conveyed by, and reflected in, a communication's payload. The two provisions therefore protect distinct categories of information and are pleaded in this Complaint based on distinct sets of factual allegations and against distinct subsets of the Trackers.

53. Section 631(a) applies to electronic communications conducted over the Internet, including communications between a user's browser and a website server. Though written in terms of wiretapping, Section 631(a) applies to Internet communications. Federal and state courts in California have consistently construed § 631(a) to protect the contents of electronic communications transmitted between users' browsers and a website's servers, including where those contents are intercepted by third-party tracking software embedded in the website.

54. A third party that is not a participant in the user-website communication, but that captures or acquires the contents of that communication during transmission by means of software embedded by the website operator on the website, is a third-party eavesdropper subject to liability under § 631(a).

/ / /

55. The party-exception to § 631(a) does not shield a third-party tracker that uses or shares the intercepted contents for its own independent commercial purposes, including identity resolution, customer matching, behavioral profiling, recommender optimization, and audience-based advertising, beyond what is necessary to carry the underlying communication.

56. The website operator that deploys the third-party tracker on its site (here, Defendant) knowing of the interception and configuring the tracker for that purpose, is liable both as a direct violator under § 631(a) and under § 631(a)'s aiding, agreement, employment, and conspiracy clause.

57. Despite predating the Internet, CIPA has been interpreted by federal courts to apply to new technologies where such application does not conflict with the statutory scheme, including with respect to the deployment of third-party tracking technologies on commercial websites.

58. The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law.

59. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III.

60. Individuals may pursue legal action against violators of any CIPA provision, including Sections 631 and 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

**2. *The Federal Wiretap Act***

61. The Federal Wiretap Act, 18 U.S.C. §§ 2510-2522, prohibits the intentional interception of electronic communications. Section 2511(1)(a) imposes liability on any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication. 18

U.S.C. § 2511(1)(a). The Wiretap Act provides a private right of action under 18 U.S.C. § 2520, by which a plaintiff whose communications have been unlawfully intercepted, disclosed, or used may recover statutory and actual damages, punitive damages, attorneys' fees, and equitable relief.

62. The Wiretap Act defines "intercept" as the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C. § 2510(4). "Contents" is defined to include any information concerning the substance, purport, or meaning of [the] communication. 18 U.S.C. § 2510(8). An "electronic communication" includes any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. 18 U.S.C. § 2510(12). Communications transmitted between users' web browsers and a website's servers over the Internet fall squarely within the statutory definition of an "electronic communication."

63. The Wiretap Act applies to the interception of the contents of electronic communications transmitted over the Internet, including communications between users' web browsers and a website's servers, and applies to interception by third-party software embedded by a website operator on the website that captures the contents of users' communications during transmission.

64. The Wiretap Act further prohibits any person who, "knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication," intentionally discloses or uses the contents of that communication. 18 U.S.C. § 2511(1)(c)-(d). A third-party tracker's downstream disclosure and use of intercepted communication contents, including for identity resolution, customer matching, behavioral profiling, recommender optimization, and audience-based advertising, and including the third party's transmission of intercepted contents to its own affiliates, partners, and downstream customers, constitutes a separate basis for Wiretap Act liability in addition to the initial interception.

65. The Wiretap Act's party exception provides that interception is not unlawful where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State. 18 U.S.C. § 2511(2)(d). The party exception does not shield a third-party tracker that intercepts the contents of users' communications for the purpose of committing a tortious or criminal act, including a violation of state privacy laws, among them the California Invasion of Privacy Act and California's constitutional right to privacy, and the common-law tort of intrusion upon seclusion.

66. The Wiretap Act provides plaintiffs whose communications have been intercepted, disclosed, or used in violation of its provisions a private right of action under 18 U.S.C. § 2520. Available remedies include (a) statutory damages of the greater of $100 per day for each day of violation or $10,000 per violation; (b) actual damages and any profits made by the violator as a result of the violation; (c) punitive damages in appropriate cases; (d) reasonable attorneys' fees and litigation costs; and (e) preliminary and equitable or declaratory relief as may be appropriate. 18 U.S.C. § 2520(b)-(c).

**3. *Data Segregation: DRAS Information v. Communication Contents***

67. The dialing, routing, addressing, and signaling information protected by California Penal Code §§ 638.50 and 638.51 (referred to herein as "DRAS Information") comprises the technical metadata generated by the act of transmitting an electronic communication, but does not include the contents of the communication itself. Cal. Penal Code § 638.50(b)-(c). DRAS Information includes, without limitation: persistent and session-level cookie and storage identifiers (such as cookies set by tracking software for purposes of cross-session and cross-site recognition); request timestamps and event-sequencing data; referrer headers limited to identifying the prior domain from which a request was directed; browser, operating system, and device characteristics; screen resolution and viewport dimensions; language and locale settings; and Internet Protocol addresses, to the extent they appear only in the network-layer routing of the request

rather than as a discrete named parameter within the application-layer payload.

68. The contents of electronic communications protected by California Penal Code § 631(a) and 18 U.S.C. § 2511 (referred to herein as "Communication Contents") comprise any information concerning the substance, purport, or meaning of the communication. In the context of users' communications with the Website, Communication Contents include, without limitation: structured event payloads in which a tracker transmits, as discrete named parameters, the substantive subject matter of the user's session, such as plaintext product names, plaintext product prices, item identifiers, content category designations, content type designations, page titles, search query terms, and similar attributes extracted from the rendered page; identity-linked customer-match identifiers transmitted by a tracker as user-level identity tokens including SHA-256-hashed values used by tracking platforms for cross-platform user identification; and, where transmitted as discrete named payload parameters identifying the substance of the page or activity the user is engaged with, full human-readable URLs of articles, blog posts, product pages, content category pages, and search-results pages.

69. Certain data elements may serve different functions depending on the manner of their transmission. A full human-readable URL such as a product-page URL is, in one sense, an addressing element identifying a network destination; in another sense, it conveys the substance of the page the user is reading and therefore part of the content of the user's communication with the Website. Similarly, an Internet Protocol address transmitted only in the network-layer routing of an HTTP request is part of the ordinary routing infrastructure of the communication; the same IP address transmitted by a tracker as a discrete, named parameter within the application-layer payload is content extracted, packaged, and conveyed for the third party's use. Where a data element serves both functions, this Complaint identifies the function on which each claim relies and pleads that data element only in support of the claim that fits that function.

/ / /

70. Consistent with this categorization, the allegations in this Complaint distinguish between data elements pleaded as DRAS Information, which support the trap-and-trace and pen-register claim under California Penal Code § 638.51, and data elements pleaded as Communication Contents, which support the wiretap claims under California Penal Code § 631 and 18 U.S.C. § 2511. Each of the Trackers captures and transmits both DRAS Information and Communication Contents to varying degrees. With respect to the DRAS Information each Tracker captures, this Complaint pleads that capture only as supporting the trap-and-trace and pen-register claim under California Penal Code § 638.51. With respect to the Communication Contents each Tracker captures, this Complaint pleads that capture only as supporting the wiretap claims under California Penal Code § 631 and 18 U.S.C. § 2511. No data element is pleaded as both DRAS Information and Communication Contents in support of overlapping claims, and the factual allegations supporting the § 638.51 claim and the factual allegations supporting the § 631 and § 2511 claims are non-overlapping at the data-element level.

**4. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices" as to DRAS Information***

71. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

72. In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers

then cause the browser to send identifying information, including the user's IP address and User Information, to the Third Parties. These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

73. A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**




74. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

75. The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as

page views, click events, session duration, and identifying browser characteristics.

76. Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

77. An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

78. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

79. Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

/ / /

---

[1] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

80. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

81. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

82. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

83. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

84. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large.

The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**




*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

85. Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

/ / /

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges: 10.0.0.0 – 10.255.255.255, 172.16.0.0 – 172.31.255.255, 192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

86. A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

87. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

88. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

89. A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming

content, and other data reaches you correctly."[4]

90. Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

91. A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

92. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

general location of the upcoming event.[11]

93. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

94. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

95. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

96. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

97. The collection of IP addresses here is particularly invasive here: As a report

---

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Busines*ses, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-willi
ams-z7bhf.

[15] *Id.*

[16] *Id.*

[17] *Id.*

from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

98. In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

99. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

/ / /

/ / /

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

100. When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

101. Often times, third-party scripts are installed on websites "for advertising purposes."[21]

102. Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

103. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

104. As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

105. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

---

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

[22] *Id.*

106. Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

107. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**5. *The Trackers Intercept the Contents of Electronic Communications They Capture***

108. When users access the Website, the Trackers' scripts execute on users' browsers and operate to capture and transmit to third-party servers, operated by MNTN, Inc. and Pinterest, Inc., the substantive contents of users' communications with the Website, including the subject matter of the pages users view, the content of users' search queries, and identity-linked information about the user. These transmissions occur in real time, contemporaneously with users' communications with the Website's servers, and without users' knowledge or consent.

109. Mechanically, the Trackers operate by extracting the substantive content of the rendered Website page, including product names, product prices, content category designations, and search query strings entered by the user, packaging that content as discrete named payload parameters in HTTP requests, and transmitting those requests to the Third Parties' endpoints. The Trackers further capture identity-linked customer-match identifiers, including SHA-256-hashed values derived from users' email

addresses, and transmit those identifiers to the Third Parties contemporaneously with the substantive content. The Trackers thereby intercept and convey to the Third Parties both the substance of users' communications with the Website and the identity of the user communicating.

110. The Mountain Tracker, operated by MNTN, Inc., captures and transmits to Mountain's px.mountain.com infrastructure (a) the plaintext name of the specific product the user is viewing on the Website (transmitted as the named payload parameter shpn); (b) the price of that product (transmitted as the named payload parameter shpp); (c) the URL of the product page being viewed (transmitted as the named payload parameter plh); and (d) a Google Analytics client_id value, by which the user's browsing activity on the Website is correlated with the user's activity recorded by Google's tracking infrastructure. Mountain further assigns and stores in users' browsers a persistent guid cookie scoped to the mountain.com domain and bearing an expiration date in January 2027, by which Mountain recognizes the same browser across multiple visits to the Website and across other websites that deploy the Mountain tracking infrastructure.

111. The Pinterest Tracker, operated by Pinterest, Inc., captures and transmits to Pinterest's ct.pinterest.com endpoint (a) the full URL of the page or search-results page the user is viewing on the Website, including the substantive content of any search query the user has entered (transmitted within a JSON-encoded payload as the field ad.loc); and (b) a SHA-256-hashed customer-match identifier of the kind Pinterest's "enhanced match" infrastructure uses for cross-platform user identification (transmitted within the same JSON-encoded payload as the field pd.em), by which Pinterest performs cross-platform customer matching and associates the user's activity on the Website with Pinterest's records of the user's identity and activity on Pinterest and elsewhere on the Internet.

112. Defendant did not obtain Plaintiff's or Class Members' consent to the deployment, operation, or transmissions of the Trackers; did not obtain any court order

authorizing the interception, disclosure, or use of the contents of users' communications by the Trackers; and had no authority under any statutory or party exception to authorize such interception, disclosure, or use.

113. Through the conduct described above, the Trackers function as devices that intercept and acquire the contents of users' electronic communications with the Website within the meaning of California Penal Code § 631 and 18 U.S.C. § 2511. The Third Parties operating the Trackers further disclose and use the intercepted contents for their own independent commercial purposes, in violation of 18 U.S.C. § 2511(1)(c)-(d). Defendant's deployment, configuration, and operation of the Trackers on the Website therefore constitutes the unauthorized interception, disclosure, and use of the contents of Plaintiff's and Class Members' electronic communications, in violation of California Penal Code § 631 and 18 U.S.C. § 2511.

**6. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

114. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness. These transmissions occurred silently, automatically, and without any visual indication to Plaintiff. No disclosure, banner, or mechanism alerted Plaintiff that his device would serve as a communication channel to multiple unrelated advertising and identity-resolution vendors.

115. The third-party transmissions were triggered the moment Plaintiff's browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST requests and routing those signals to multiple advertising and identity-resolution endpoints before the requested pages finished loading or became visible on his device.

116. The Trackers also causes additional data points to be sent from Plaintiff's

and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

117. This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

118. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

119. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known

logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

120. In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

121. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

122. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**7. *Plaintiff And Class Members' Data Has Financial Value***

123. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

/ / /

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

124. Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

125. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

126. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

127. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and

---

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3d 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3d 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

$150-240 per credit card number or social security number.[27]

128. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

129. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

130. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

### 8. *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent*

131. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

132. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

133. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

134. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked

across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### *9. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

135. The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

136. As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

137. To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

138. In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

/ / /

/ / /

**a. Data Brokers And Real-Time Bidding: The Information Economy**

*Data Brokers*

139. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

140. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

141. For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

/ / /

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

[30] SHERMAN, *supra*, at 2.

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

142. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

143. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

144. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or

---

[33] SHERMAN, *supra*, at 1.
[34] *Id.*
[35] *Id.* at 9.

> those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

145. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

/ / /

/ / /

/ / /

---

[36] *Id.*

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 4:**




146. As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

/ / /

[38] *Id.* at 11.

147. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

148. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

149. In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

150. These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

/ / /

---

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

*Real-Time Bidding*

151. Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

152. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

153. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

154. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

155. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.
[42] *Id.*
[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

> Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

**Figure 5:**




156. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

> viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

**Figure 6:**




157. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

/ / /

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

158. Likewise, a DSP can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

159. All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

160. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

a. "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

b. "send[ing] sensitive data across geographic borders."

c. sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

161. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

/ / /

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[47] Geoghegan, *supra*.

162. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[48]:

**Figure 7:**




163. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

/ / /

[48] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

*Cookie Syncing*

164. It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

165. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

166. Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com.

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

**Figure 8:**




[51] Papadopoulos, *supra*, at 1433.

167. Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

168. On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[54] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

169. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

170. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Website.

171. To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The

---

[52] Papadopoulos, *supra*, at 1434.
[53] *Id.*
[54] *See id.*
[55] *Id.*
[56] *Id.* at 1441.

Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

172. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

173. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

174. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

175. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior

at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

176. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

177. Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

178. The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

***10. Defendant's Privacy Policy Misrepresentations and Unjust Enrichment***

179. Defendant's ability to monetize users' browsing activity through tracking depends on users' reasonable belief that their interactions with the Website will not be automatically disclosed to third parties without notice or a meaningful opportunity to exercise choice. That belief is fostered by Defendant's Privacy Policy, which represents

that users retain control over their personal information and that data sharing occurs subject to user rights, preferences, and applicable limitations.

180. Defendant's Privacy Policy emphasizes opt-out rights, preference management, and user control over cookies, tracking technologies, and interest-based advertising, and represents that users may limit or prevent the selling or sharing of their personal information for advertising and related purposes.

181. In practice, however, Defendant's Website causes users' browsers to transmit routing, addressing, and signaling information to third-party analytics, advertising, and recommender platforms automatically upon page load and navigation, before any opt-out mechanism can be accessed or exercised. These transmissions include page URLs, referrer paths, timestamps, session and event identifiers, and browser and device characteristics.

182. Because these disclosures occur automatically and in real time, the user-choice mechanisms described in Defendant's Privacy Policy cannot prevent the initial capture and transmission of user data. Preference signals and opt-out tools operate, at most, after the underlying routing and signaling information has already been transmitted to third parties.

183. Defendant derives substantial commercial value from this tracking. Detailed browsing and navigation data increases the value of users within the advertising ecosystem and enhances Defendant's advertising measurement, retargeting, and marketing optimization efforts, while also providing Defendant with granular insights into consumer behavior.

184. Defendant could not have obtained this value through transparent means. Had Defendant disclosed that routine browsing of product pages would automatically result in immediate third-party data transmission before any choice could be exercised, reasonable users would have declined to proceed or limited their interaction with the Website.

/ / /

185. By representing that users are in control of their personal information while simultaneously deploying tracking technologies that execute before any control is possible, Defendant obtained valuable routing and signaling data without providing the promised notice or meaningful choice.

186. Defendant was unjustly enriched by retaining the benefits of this tracking at the expense of Plaintiff and Class Members, who suffered the loss of privacy inherent in the undisclosed and unconsented-to transmission of their Website interaction data.

187. Plaintiff has visited the Website on multiple occasions during the class period for the purpose of browsing and researching products offered by Defendant. Defendant did not adequately or specifically disclose to users, including Plaintiff, that the contents of users' communications with the Website, including users' search queries, the specific products users view, the prices of those products, and identity-linked customer-match identifiers, would be intercepted in real time by third-party tracking software and transmitted to third parties for use in cross-platform identity matching, behavioral profiling, and targeted advertising.

188. Plaintiff would not have used the Website in the manner he did, and would not continue to use the Website, had he known of the actual practices alleged herein. Plaintiff did not, by his conduct, manifest a voluntary consent to those actual practices. Plaintiff intends to continue to browse and research products offered by Defendant in the future, but his continued use is conditioned on, and limited by, his understanding that Defendant will either cease the challenged practices or make the disclosures necessary for users meaningfully to consent to or decline them. Until Defendant ceases or remedies the challenged practices, Plaintiff remains subject to the ongoing risk of further unauthorized interception, disclosure, and use of the contents of his communications with the Website.

## V. <u>SPECIFIC ALLEGATIONS</u>

### *1. The Google Trackers*

189. The Website embeds Google Tag Manager and Google Analytics, which

automatically execute upon page load. As configured, these Google Trackers collect and transmit dialing, routing, addressing, and signaling information associated with users' interactions with the Website, including referrer headers, timestamps and event-sequencing data, browser and device characteristics, network-layer routing information, and persistent Google-assigned identifiers. Through this operation, the Google Trackers function, as to such non-content information, as pen registers and trap-and-trace devices or processes within the meaning of California Penal Code § 638.51.

190. **Figure 9** is a Chrome DevTools Network capture from the Hobby Lobby home page showing automatic requests to Google-controlled domains, including https://www.googletagmanager.com/gtm.js?id=GTM-…, initiated during page load without any user interaction. The capture reflects the destination hostwww.googletagmanager.com, the GET request method, and a successful response. This evidence shows that the Website initializes Google's tracking infrastructure as part of the initial page rendering process.

**Figure 9:**




/ / /

191. **Figure 10** is a Wireshark capture showing DNS queries and responses resolving Google Analytics and Google Tag Manager domains, including analytics.google.com and googletagmanager.com, to Google-controlled IP addresses. This evidence confirms that tracking traffic generated by the Website is routed from the user's device to Google infrastructure at the network layer. No application-layer payload content is reflected in this capture.

**Figure 10:**




192. **Figure 11** is a Fiddler capture of a Google Analytics collection request observed at the proxy level while in transit, showing an outbound HTTP request from the user's browser to https://www.google.analytics.com/g/collect. The captured request reflects transmission of signaling data, including referrer information, timing data, browser and device characteristics, and a persistent Google Analytics client identifier (cid), from the browser to Google's analytics endpoint.

/ / /

/ / /

**Figure 11:**




193. The Google Analytics request shown in Figure 11 transmits addressing and routing information identifying the network destinations of the user's communications, the relationship between referring and destination domains, and the timing and sequencing of user interactions. This information falls squarely within the scope of dialing, routing, addressing, and signaling information protected by California Penal Code § 638.51.

194. The Google Trackers operate as a "process" because they are software mechanisms that execute on users' devices to assign persistent identifiers, collect signaling metadata, and correlate that data across multiple requests and sessions. They also operate as a "device" because the tracking code runs on users' computing hardware to capture and transmit that signaling information.

195. Defendant did not obtain a court order authorizing the installation or use of any pen register or trap-and-trace device or process and did not obtain users' consent to deploy the Google Trackers or to transmit dialing, routing, addressing, or signaling information associated with users' Website interactions to Google.

196. Defendant's installation and operation of the Google Trackers therefore constitutes the unauthorized use of pen registers and trap-and-trace devices or processes in violation of California Penal Code § 638.51.

197. Beyond the dialing, routing, addressing, and signaling information described in Paragraphs 193-200, the Google Trackers also capture and transmit to Google the substantive contents of users' communications with the Website. Specifically, the Google Trackers transmit, as discrete named payload parameters: the substantive content of users' search queries (in the parameter ep.search_term, including for example "jesus" and "jesus saves"); event identifiers describing users' specific interactions with content, including page_view events transmitted on every page load, view_item events transmitted when the user views a product detail page, and view_search_results events transmitted when the user submits a search query (with the corresponding ep.search_term parameter conveying the substantive content of the search and an ep.page_type=search parameter identifying the event as a search-results view); the price of products users view (in the parameter epn.value, including for example values such as 21.49, 27.49, and 3.99); and the page title of each page users view (in the parameter dt, including titles such as "Jesus Walking On Water Framed Canvas Wall Decor | Hobby Lobby | 2435634"). The same requests further transmit to Google a Google Analytics client identifier (cid), an additional user-level identifier (auid), and an anonymous user identifier (up.anonymous_user_id), by which Google associates the substantive content of the user's interactions with the Website with a persistent identity token.

198. **Figure 12** is a Chrome DevTools Network capture of a Google Analytics collection request transmitted while the user was on a product detail page on the Website, showing Google receiving product-page context through Google's collection endpoint at https://analytics.google.com/g/collect. The capture reflects, as discrete named payload parameters, a human-readable product-page destination URL (dl) and referring-page URL (dr), the page title displayed in the user's browser (dt), the GA4 measurement

identifier (tid) for Hobby Lobby's Google Analytics property, an event-type designation identifying the event as a page_view, an ep.page_type parameter labeling the page as a "productDetail" page, the persistent Google Analytics client identifier (cid), and bound first-party user-level identifier fields (including up.client_id and up.customer_id) by which Google associates the user's interaction with the product detail page with a persistent identity token.

**Figure 12:**




199. The Google Trackers operate as a "machine, instrument, or contrivance" within the meaning of California Penal Code § 631(a), and as an "electronic, mechanical, or other device" within the meaning of 18 U.S.C. § 2510(4), with respect to the Communication Contents they capture. The Google Trackers execute as software code on users' devices to capture substantive content from rendered pages, package that content as named payload parameters, and transmit those parameters to Google's servers, while assigning persistent identifiers and correlating that data across multiple requests, sessions, and websites.

200. Defendant did not obtain Plaintiff's or Class Members' consent to the

deployment, operation, or transmissions of the Google Trackers as devices intercepting Communication Contents, and had no authority under any statutory or party exception to authorize the interception, disclosure, or use of the contents of users' communications by the Google Trackers. Google LLC is not a party to the underlying communications between users and the Website, and uses the intercepted contents for its own independent commercial purposes, including identity resolution, customer matching, behavioral profiling, audience-based advertising, and the further disclosure of intercepted contents to Google's affiliates, partners, and downstream advertising customers, beyond what is necessary to carry the underlying communication.

201. Defendant's installation, configuration, and operation of the Google Trackers on the Website therefore constitutes the unauthorized interception, disclosure, and use of the contents of Plaintiff's and Class Members' electronic communications with the Website, in violation of California Penal Code § 631 and 18 U.S.C. § 2511, in addition to the trap-and-trace and pen-register violation alleged in Paragraphs 193-200.

***2. The Facebook Tracker***

202. The Website embeds the Facebook Tracker, which automatically executes upon page load and during subsequent page navigation. As configured, the Facebook Tracker collects and transmits dialing, routing, addressing, and signaling information associated with users' interactions with the Website, including referrer headers, timestamps and event-sequencing data, browser and device characteristics, network-layer routing information, and persistent Facebook-assigned identifiers. Through this operation, the Facebook Tracker functions, as to such non-content information, as a pen register and trap-and-trace device or process within the meaning of California Penal Code § 638.51.

203. **Figure 13** is a Chrome DevTools Network capture from the Hobby Lobby home page showing automatic requests to Facebook-controlled domains, including https://connect.facebook.net/en_US/fbevents.js, initiated during page load without any user interaction. The capture reflects the destination host connect.facebook.net, the

request method, and a successful response. This evidence shows that the Website initializes Facebook's tracking infrastructure as part of the initial page rendering process.

**Figure 13:**




204. **Figure 14** is a Wireshark capture showing DNS queries and responses resolving Facebook-controlled domains, including connect.facebook.net and facebook.com, to Facebook-controlled IP addresses. This evidence confirms that tracking traffic generated by the Website is routed from the user's device to Facebook infrastructure at the network layer. No application-layer payload content is reflected in this capture.

/ / /

/ / /

/ / /

**Figure 14:**




205. **Figure 15** is a Fiddler capture of a Facebook tracking request observed at the proxy level while in transit, showing an outbound HTTP request from the user's browser to Facebook's tracking endpoint. The captured request reflects transmission of signaling data, including referrer information, timing data, browser and device characteristics, and a persistent Facebook browser identifier (_fbp), from the browser to Facebook-controlled servers.

/ / /

/ / /

/ / /

**Figure 15:**




206. The Facebook tracking request shown in Figure 15 transmits addressing and routing information identifying the network destinations of the user's communications, the relationship between referring and destination domains, and the timing and sequencing of user interactions. This information falls squarely within the scope of dialing, routing, addressing, and signaling information protected by California Penal Code § 638.51.

207. The Facebook Tracker operates as a "process" because it is a software mechanism that executes on users' devices to assign persistent identifiers, collect signaling metadata, and correlate that data across multiple requests and sessions. It also operates as a "device" because the tracking code runs on users' computing hardware to capture and transmit that signaling information.

208. Defendant did not obtain a court order authorizing the installation or use of any pen register or trap-and-trace device or process and did not obtain users' consent to deploy the Facebook Tracker or to transmit dialing, routing, addressing, or signaling information associated with users' Website interactions to Facebook.

209. Defendant's installation and operation of the Facebook Tracker therefore

constitutes the unauthorized use of a pen register and trap-and-trace device or process in violation of California Penal Code § 638.51.

210. Beyond the dialing, routing, addressing, and signaling information described in Paragraphs 206-213, the Facebook Tracker also captures and transmits to Facebook the substantive contents of users' communications with the Website. The Facebook Tracker fires two distinct categories of events, both of which transmit substantive content. First, on every page navigated by the user, the Facebook Tracker fires a PageView event that transmits, as discrete named payload parameters: the page title of each page users view (in the parameter pmd[title], including titles such as "Jesus Walking On Water Framed Canvas Wall Decor | Hobby Lobby | 2435634"); the full plaintext description of each product users view, extracted from the rendered page (in the parameter pmd[description], including descriptions such as "Display a reminder of who Jesus is in your living room with the gorgeous Jesus Walking On Water Framed Canvas Wall Decor. This profound art piece features an image of Jesus, hands outstretched, walking on water with a lovely sunrise in the background"); structured product-content data, including product identifiers, names, descriptions, aggregate ratings, review counts, and item conditions, transmitted within multipart-form POST bodies; and the full URL of the page being viewed by the user (in the parameter dl), including the substantive content of any search query the user has entered (e.g., URLs such as search?query=jesus and search?query=jesus%20saves). Second, on each product detail page the user views, the Facebook Tracker fires a separate ViewContent event (transmitted as ev=ViewContent) that carries, as discrete named payload parameters: the plaintext name of the specific product the user is viewing (in the parameter cd[content_name], including for example "Jesus Walking On Water Framed Canvas Wall Decor," "Jesus Walking On Soft Path Canvas Wall Decor," and "Jesus Saves Foam Trucker Hat"); a content-type designation identifying the page subject as a product (in the parameter cd[content_type], with the value "product"); and the product identifier (in the parameter cd[content_ids], including for example "2435634," "2564045," and

"2535813"). The ViewContent event is fired in addition to and contemporaneously with the PageView event, and conveys to Facebook the specific item Plaintiff was viewing as a discrete extracted field, rather than as part of a URL or general page metadata. All such requests further transmit to Facebook a persistent Facebook browser identifier (_fbp), by which Facebook associates the substantive content of the user's interactions with the Website with a persistent identity token.

211. The Facebook Tracker's transmissions of Communication Contents described in Paragraph 214 occur automatically upon page load and during navigation, contemporaneously with users' communications with the Website's servers. The plaintext product descriptions, page titles, and structured product-content fields transmitted to Facebook are extracted from the rendered Website page and packaged into the Facebook Tracker's outbound HTTP requests by software code embedded by Defendant in the Website, namely the Facebook Pixel script loaded from connect.facebook.net/en_US/fbevents.js as identified in Paragraph 207. Each such transmission constitutes a discrete interception of the substantive content of the user's communication with the Website, occurring before the requested page has finished rendering on the user's device and before any opportunity for user consent has been provided.

212. The Facebook Tracker operates as a "machine, instrument, or contrivance" within the meaning of California Penal Code § 631(a), and as an "electronic, mechanical, or other device" within the meaning of 18 U.S.C. § 2510(4), with respect to the Communication Contents it captures. The Facebook Tracker executes as software code on users' devices to capture substantive content from rendered pages, package that content as named payload parameters and structured multipart POST bodies, and transmit those payloads to Facebook's servers, while assigning persistent identifiers and correlating that data across multiple requests, sessions, and websites.

213. Defendant did not obtain Plaintiff's or Class Members' consent to the deployment, operation, or transmissions of the Facebook Tracker as a device

intercepting Communication Contents, and had no authority under any statutory or party exception to authorize the interception, disclosure, or use of the contents of users' communications by the Facebook Tracker. Meta Platforms, Inc. is not a party to the underlying communications between users and the Website, and uses the intercepted contents for its own independent commercial purposes, including identity resolution, customer matching, behavioral profiling, audience-based advertising, and the further disclosure of intercepted contents to Meta's affiliates, partners, and downstream advertising customers, beyond what is necessary to carry the underlying communication.

214. Defendant's installation, configuration, and operation of the Facebook Tracker on the Website therefore constitutes the unauthorized interception, disclosure, and use of the contents of Plaintiff's and Class Members' electronic communications with the Website, in violation of California Penal Code § 631 and 18 U.S.C. § 2511, in addition to the trap-and-trace and pen-register violation alleged in Paragraphs 206-213.

### *3. The Scarab Research Tracker*

215. The Website embeds third-party recommender and behavioral tracking technology operated by ScarabResearch, which executes automatically upon page load and during subsequent navigation. As configured, the ScarabResearch Tracker collects and transmits dialing, routing, addressing, and signaling information associated with users' interactions with the Website, including referrer headers, navigation-sequencing parameters, timestamps, browser and device characteristics, network-layer routing information, and persistent Scarab-assigned identifiers. Through this operation, the ScarabResearch Tracker functions, as to such non-content information, as a pen register and trap-and-trace device or process within the meaning of California Penal Code § 638.51.

216. **Figure 16** is a Chrome DevTools Network capture of a recommender request sent to https://recommender.scarabresearch.com while the user navigated the Website. The request includes navigation-sequencing parameters by which ScarabResearch receives information identifying the sequencing and timing of users'

navigation across the Website. ScarabResearch uses such information, together with the persistent visitor identifier described below, to recognize the same browser across multiple visits to the Website.

**Figure 16:**




217. **Figure 17** is a Wireshark capture showing DNS queries and responses resolving ScarabResearch-controlled domains, including cdn.scarabresearch.com and recommender.scarabresearch.com, to ScarabResearch-controlled IP addresses. This evidence confirms that recommender tracking traffic generated by the Website is routed from the user's device to ScarabResearch infrastructure at the network layer. No application-layer payload content is reflected in this capture.

/ / /

/ / /

/ / /

**Figure 17:**




218. The recommender requests shown in Figures 16 and 17 transmit addressing and routing information identifying the network destinations of the user's communications and the sequencing of user navigation. This information falls within the scope of dialing, routing, addressing, and signaling information protected by California Penal Code § 638.51.

219. The ScarabResearch Tracker operates as a "process" because it is a software mechanism that executes on users' devices to assign persistent identifiers, collect navigation and signaling metadata, and correlate that data across multiple requests and browsing sessions. It also operates as a "device" because the tracking code runs on users' computing hardware to capture and transmit that signaling information.

220. By assigning and reading persistent identifiers such as the scarab.visitor cookie and the cdv cookie, the ScarabResearch Tracker enables ScarabResearch to recognize the same browser across multiple visits and to associate page-level navigation signals over time for recommender and commercial optimization purposes.

/ / /

221. Defendant did not obtain a court order authorizing the installation or use of any pen register or trap-and-trace device or process and did not obtain users' consent to deploy the ScarabResearch Tracker or to transmit dialing, routing, addressing, or signaling information associated with users' Website interactions to ScarabResearch.

222. Defendant's installation and operation of the ScarabResearch Tracker therefore constitutes the unauthorized use of a pen register and trap-and-trace device or process in violation of California Penal Code § 638.51.

223. Beyond the dialing, routing, addressing, and signaling information described in Paragraphs 219-226, the ScarabResearch Tracker also captures and transmits to ScarabResearch the substantive contents of users' communications with the Website. As reflected in the same Chrome DevTools capture identified in **Figure 16**, the ScarabResearch Tracker transmits, in the named payload parameter prev_url, the full URL of the previously viewed page in the user's session, including the substantive content of any search query the user has entered (such as URLs in the form search?query=jesus and search?query=jesus%20saves), and the full URL of any product detail page the user has just viewed. The same requests further transmit to ScarabResearch a persistent visitor identifier (vi), and ScarabResearch's response sets a persistent cdv cookie in the user's browser bearing an expiration date in January 2027, by which ScarabResearch associates the substantive content of the user's interactions with the Website with a persistent identity token.

224. The ScarabResearch Tracker operates as a "machine, instrument, or contrivance" within the meaning of California Penal Code § 631(a), and as an "electronic, mechanical, or other device" within the meaning of 18 U.S.C. § 2510(4), with respect to the Communication Contents it captures. The ScarabResearch Tracker executes as software code on users' devices to capture the URLs of pages users have viewed, including the substantive content of search queries embedded in those URLs, and transmits those URLs to ScarabResearch's servers, while assigning persistent identifiers and correlating that data across multiple requests, sessions, and websites.

225. Defendant did not obtain Plaintiff's or Class Members' consent to the deployment, operation, or transmissions of the ScarabResearch Tracker as a device intercepting Communication Contents, and had no authority under any statutory or party exception to authorize the interception, disclosure, or use of the contents of users' communications by the ScarabResearch Tracker. ScarabResearch, Inc. is not a party to the underlying communications between users and the Website, and uses the intercepted contents for its own independent commercial purposes, including recommender optimization, behavioral profiling, and audience-based advertising, beyond what is necessary to carry the underlying communication.

226. Defendant's installation, configuration, and operation of the ScarabResearch Tracker on the Website therefore constitutes the unauthorized interception, disclosure, and use of the contents of Plaintiff's and Class Members' electronic communications with the Website, in violation of California Penal Code § 631 and 18 U.S.C. § 2511, in addition to the trap-and-trace and pen-register violation alleged in Paragraphs 219-226.

**4. *The Mountain Tracker***

227. The Website embeds third-party advertising and analytics tracking technology operated by MNTN, Inc. (referred to herein as the "Mountain Tracker"), which executes automatically upon page load and during subsequent navigation. As configured, the Mountain Tracker collects and transmits dialing, routing, addressing, and signaling information associated with users' interactions with the Website to MNTN's tracking infrastructure operating from the px.mountain.com, dx.mountain.com, and gs.mountain.com endpoints, including referrer headers, request timestamps and event-sequencing data, browser and device characteristics, network-layer routing information, and persistent Mountain-assigned identifiers. Through this operation, the Mountain Tracker functions, as to such non-content information, as a pen register and trap-and-trace device or process within the meaning of California Penal Code § 638.51.

/ / /

228. **Figure 18** is a Chrome DevTools Network capture from the Hobby Lobby website showing automatic requests to MNTN-controlled domains, including https://px.mountain.com/st, initiated during page load without any user interaction. The capture reflects the destination host px.mountain.com, the GET request method, and a successful response. This evidence shows that the Website initializes Mountain's tracking infrastructure as part of the initial page rendering process.

**<u>Figure 18:</u>**




229. **Figure 19** is a Chrome DevTools Application capture showing the assignment and storage of a persistent Mountain identifier cookie in the user's browser. The cookie, named guid and scoped to the .mountain.com domain, contains a unique value and bears an expiration date in 2027. By assigning and reading this persistent identifier, MNTN recognizes the same browser across multiple visits to the Website and across other websites and applications that deploy the Mountain tracking infrastructure.

/ / /

/ / /

**Figure 19:**




230. **Figure 20** is a Wireshark capture showing DNS queries and responses resolving Mountain-controlled domains, including dx.mountain.com, px.mountain.com, and gs.mountain.com, to MNTN-controlled IP addresses. This evidence confirms that tracking traffic generated by the Website is routed from the user's device to MNTN's infrastructure at the network layer.

/ / /

/ / /

/ / /

**Figure 20:**




231. The Mountain tracking traffic shown in Figures 18 through 20 transmits addressing and routing information identifying the network destinations of the user's communications, the timing and sequencing of user interactions, and persistent identifiers by which MNTN recognizes the same browser across multiple visits. This information falls within the scope of dialing, routing, addressing, and signaling information protected by California Penal Code § 638.51.

232. The Mountain Tracker operates as a "process" because it is a software mechanism that executes on users' devices to assign persistent identifiers, collect signaling metadata, and correlate that data across multiple requests, sessions, and websites. It also operates as a "device" because the tracking code runs on users' computing hardware to capture and transmit that signaling information.

233. Defendant did not obtain a court order authorizing the installation or use of any pen register or trap-and-trace device or process and did not obtain users' consent to deploy the Mountain Tracker or to transmit dialing, routing, addressing, or signaling information associated with users' Website interactions to MNTN.

234. Defendant's installation and operation of the Mountain Tracker therefore constitutes the unauthorized use of a pen register and trap-and-trace device or process in violation of California Penal Code § 638.51.

235. Beyond the dialing, routing, addressing, and signaling information described in Paragraphs 231-238, the Mountain Tracker also captures and transmits to MNTN the substantive contents of users' communications with the Website.

236. **Figure 21** is a Fiddler raw-HTTP capture of a Mountain tracking request observed while the user viewed a specific product detail page on the Website, showing an outbound HTTP request from the user's browser to https://px.mountain.com/st. The captured request transmits, as discrete named payload parameters, the plaintext name of the product the user is viewing, the plaintext price of that product, and the URL of the product page being viewed, together with persistent identifiers and a Google Analytics cookie-sync value. The captured request also reflects the inclusion of the HTTP Referer header identifying the Website (https://www.hobbylobby.com/) as the originating page.

**Figure 21:**




/ / /

237. Specifically, the Mountain Tracker transmits to MNTN, as discrete named payload parameters: the plaintext product name (in the parameter shpn, including for example "Jesus Walking On Water Framed Canvas Wall Decor," "Jesus Walking On Soft Path Canvas Wall Decor," and "Jesus Saves Foam Trucker Hat"); the plaintext product price (in the parameter shpp, including for example values such as 27.49, 21.49, and 3.99); the product slug (in the parameter shps, including values such as "jesuswalkingonwaterframedcanvaswalldecor"); the product image URL (in the parameter shpi); the URL of the product page being viewed (in the parameter plh); and the page title of each page users view (in the parameter shpt, including titles such as "Jesus Walking On Water Framed Canvas Wall Decor | Hobby Lobby | 2435634"). The Mountain Tracker further transmits to MNTN the full plaintext meta-description of the product extracted from the rendered page (within the structured field meta_tag_data as the field description.content), including for example descriptions such as "Display a reminder of who Jesus is in your living room with the gorgeous Jesus Walking On Water Framed Canvas Wall Decor. This profound art piece features an image of Jesus, hands outstretched, walking on water with a lovely sunrise in the background."

238. The Mountain tracking requests further transmit to MNTN, as a named payload parameter, a Google Analytics client identifier (in the parameter ga_client_id) by which the user's browsing activity on the Website is correlated with the user's activity recorded by Google's tracking infrastructure on the Website and on other websites and platforms. Through this correlation, the Mountain Tracker links the user's specific product-page interactions, including the substantive contents identified in Paragraph 241, to a persistent identity token used across the digital advertising ecosystem.

239. The Mountain Tracker operates as a "machine, instrument, or contrivance" within the meaning of California Penal Code § 631(a), and as an "electronic, mechanical, or other device" within the meaning of 18 U.S.C. § 2510(4), with respect to the Communication Contents it captures. The Mountain Tracker executes as software code on users' devices to capture substantive content from rendered pages, package that

content as named payload parameters, and transmit those parameters to MNTN's servers, while assigning persistent identifiers and correlating that data across multiple requests, sessions, and websites.

240. Defendant did not obtain Plaintiff's or Class Members' consent to the deployment, operation, or transmissions of the Mountain Tracker as a device intercepting Communication Contents, and had no authority under any statutory or party exception to authorize the interception, disclosure, or use of the contents of users' communications by the Mountain Tracker. MNTN, Inc. is not a party to the underlying communications between users and the Website, and uses the intercepted contents for its own independent commercial purposes, including identity resolution, customer matching, behavioral profiling, and audience-based advertising, beyond what is necessary to carry the underlying communication.

241. Defendant's installation, configuration, and operation of the Mountain Tracker on the Website therefore constitutes the unauthorized interception, disclosure, and use of the contents of Plaintiff's and Class Members' electronic communications with the Website, in violation of California Penal Code § 631 and 18 U.S.C. § 2511, in addition to the trap-and-trace and pen-register violation alleged in Paragraphs 231-238.

**5. *The Pinterest Tracker***

242. The Website embeds third-party advertising and analytics tracking technology operated by Pinterest, Inc. (referred to herein as the "Pinterest Tracker"), which executes automatically upon page load and during subsequent navigation. As configured, the Pinterest Tracker collects and transmits dialing, routing, addressing, and signaling information associated with users' interactions with the Website to Pinterest's tracking infrastructure operating from the ct.pinterest.com endpoint, including referrer headers, request timestamps and event-sequencing data, browser and device characteristics, network-layer routing information, and persistent Pinterest-assigned identifiers. Through this operation, the Pinterest Tracker functions, as to such non-content information, as a pen register and trap-and-trace device or process within the

meaning of California Penal Code § 638.51.

243. **Figure 22** is a Chrome DevTools Network capture of the response headers returned by Pinterest in response to a tracking request from the Website. The response includes a Set-Cookie directive for a Pinterest-controlled cookie (ar_debug) scoped to the .pinterest.com domain and bearing a forward-dated expiration, showing that Pinterest caused browser-side cookie storage in the user's browser in response to the tracking request initiated from the Website.

**Figure 22:**




244. **Figure 23** is a Wireshark capture showing DNS queries and responses resolving Pinterest-controlled domains, including ct.pinterest.com, to Pinterest-controlled IP addresses. This evidence confirms that tracking traffic generated by the Website is routed from the user's device to Pinterest's infrastructure at the network layer.

/ / /

/ / /

**Figure 23:**




245. The Pinterest tracking traffic shown in Figures 22 and 23 transmits addressing and routing information identifying the network destinations of the user's communications and the timing and sequencing of user interactions. This information falls within the scope of dialing, routing, addressing, and signaling information protected by California Penal Code § 638.51.

246. The Pinterest Tracker operates as a "process" because it is a software mechanism that executes on users' devices to assign persistent identifiers, collect signaling metadata, and correlate that data across multiple requests, sessions, and websites. It also operates as a "device" because the tracking code runs on users' computing hardware to capture and transmit that signaling information.

247. Defendant did not obtain a court order authorizing the installation or use of any pen register or trap-and-trace device or process and did not obtain users' consent to deploy the Pinterest Tracker or to transmit dialing, routing, addressing, or signaling information associated with users' Website interactions to Pinterest.

/ / /

248. Defendant's installation and operation of the Pinterest Tracker therefore constitutes the unauthorized use of a pen register and trap-and-trace device or process in violation of California Penal Code § 638.51.

249. Beyond the dialing, routing, addressing, and signaling information described in Paragraphs 246-252, the Pinterest Tracker also captures and transmits to Pinterest the substantive contents of users' communications with the Website, together with identity-linked customer-match identifiers.

250. **Figure 24** is a Chrome DevTools Network capture of an automatic request to Pinterest-controlled infrastructure at https://ct.pinterest.com/v3/, initiated during page load without any user interaction. The captured request transmits, within a JSON-encoded payload (the pd parameter), a SHA-256-hashed customer-match identifier of the kind Pinterest's "enhanced match" infrastructure uses for cross-platform user identification (in the field em), together with a Pinterest-assigned user-level identifier (in the field pin_unauth). The captured request further transmits, within a separate JSON-encoded payload (the ad parameter), the full URL of the page or search-results page the user is viewing on the Website (in the field loc), including the substantive content of any search query the user has entered.

/ / /

/ / /

/ / /

**Figure 24:**




251. **Figure 25** is a Fiddler raw-HTTP capture showing payload transmissions. The capture displays the raw GET request to https://ct.pinterest.com/v3/, including the pd and ad parameters, the Origin header (https://www.hobbylobby.com), and the Referer header (https://www.hobbylobby.com), confirming that the request was initiated from the Website during the user's browsing session.

/ / /

/ / /

/ / /

## Figure 25:




252. Specifically, the Pinterest Tracker transmits to Pinterest, as fields within payload parameters: a SHA-256-hashed customer-match identifier of the kind Pinterest's "enhanced match" infrastructure uses for cross-platform user identification (in the pd.em field); a Pinterest-assigned user-level identifier (in the pd.pin_unauth field); the full URL of the page or search-results page being viewed by the user (in the ad.loc field), including the substantive content of any search query the user has entered (such as URLs in the form search?query=jesus and search?query=jesus%20saves); the URL of any page from which the user navigated to the current page (in the ad.ref field); and a Pinterest advertiser tag identifier (in the tid parameter), by which Pinterest associates the substantive content of the user's interactions with the Website with a persistent identity token used across Pinterest's enhanced-match and audience-based advertising infrastructure.

253. The Pinterest Tracker operates as a "machine, instrument, or contrivance" within the meaning of California Penal Code § 631(a), and as an "electronic, mechanical, or other device" within the meaning of 18 U.S.C. § 2510(4), with respect to the

Communication Contents it captures. The Pinterest Tracker executes as software code on users' devices to capture substantive content from rendered pages and identity-linked customer-match identifiers, package that content within JSON-encoded payload parameters, and transmit those parameters to Pinterest's servers, while assigning persistent identifiers and correlating that data across multiple requests, sessions, and websites.

254. Defendant did not obtain Plaintiff's or Class Members' consent to the deployment, operation, or transmissions of the Pinterest Tracker as a device intercepting Communication Contents, and had no authority under any statutory or party exception to authorize the interception, disclosure, or use of the contents of users' communications by the Pinterest Tracker. Pinterest, Inc. is not a party to the underlying communications between users and the Website, and uses the intercepted contents, including the customer-match identifier and content URL transmitted to Pinterest's enhanced-match infrastructure, for its own independent commercial purposes, including identity resolution, cross-platform customer matching, behavioral profiling, and audience-based advertising, beyond what is necessary to carry the underlying communication.

255. Defendant's installation, configuration, and operation of the Pinterest Tracker on the Website therefore constitutes the unauthorized interception, disclosure, and use of the contents of Plaintiff's and Class Members' electronic communications with the Website, in violation of California Penal Code § 631 and 18 U.S.C. § 2511, in addition to the trap-and-trace and pen-register violation alleged in Paragraphs 246-252.

## VI. CLASS ALLEGATIONS

256. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

257. Plaintiff further defines two subclasses:

a) The "Content Interception Subclass," consisting of all persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by Defendant's Website during the relevant statute of limitations period, and the Communication Contents of whose electronic communications with the Website (including without limitation plaintext product names, plaintext product prices, search query strings, structured product-content data, page titles, identity-linked customer-match identifiers, and full-path URLs identifying specific content viewed) were intercepted, disclosed, or used by the Third Parties operating the Trackers without consent.

b) The "Pen Register Subclass," consisting of all persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period, and whose non-content dialing, routing, addressing, or signaling information was captured and transmitted to third parties without consent or a court order.

258. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

259. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;

/ / /

- Whether the Trackers intercept the contents of electronic communications between Plaintiff and Class Members and the Website within the meaning of California Penal Code section 631;
- Whether the Trackers intercept electronic communications within the meaning of 18 U.S.C. section 2511;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by California Penal Code section 638.51;
- Whether the full-path URLs transmitted by the Trackers to third parties constitute the contents of electronic communications;
- Whether Plaintiff and Class Members are subject to the same tracking policies and practices;
- Whether Defendant violated California Penal Code section 631;
- Whether Defendant violated 18 U.S.C. section 2511;
- Whether Defendant violated California Penal Code section 638.51;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice; and
- Whether Plaintiff and the Class Members are entitled to equitable relief for unjust enrichment.

260. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

261. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

262. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII. FIRST CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511 (Federal Wiretap Act)

### By Plaintiff and the Content Interception Subclass Against All Defendants

263. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except as to those allegations regarding claims based on Dialing, Routing, Addressing and Signaling information.

264. Plaintiff brings this cause of action individually and on behalf of the members of the Content Interception Subclass against Defendant.

265. During the relevant statute of limitations period, Defendant intentionally caused the interception of electronic communications between Plaintiff and Class Members and the Website by embedding and deploying third-party tracking technologies on the Website.

266. During the relevant statute of limitations period, Defendant intentionally caused the interception of the contents of electronic communications between Plaintiff and Class Members and the Website by embedding and deploying on the Website the Trackers, namely the Google Trackers, the Facebook Tracker, the Scarab Research Tracker, the Mountain Tracker, and the Pinterest Tracker, all as identified and described herein.

267. The intercepted communications included the Communication Contents of Plaintiff's and Class Members' electronic communications with the Website, including without limitation: plaintext product names and prices extracted from Website pages and transmitted to third parties as discrete named payload parameters; the substantive content of search queries entered by Plaintiff and Class Members; structured product-content data, including product identifiers, descriptions, and ratings; page titles containing product names; identity-linked customer-match identifiers; and full-path URLs revealing the specific content Plaintiff and Class Members read or viewed on the Website. These categories of intercepted information reveal the substance, purport, and meaning of Plaintiff's and Class Members' communications with the Website and constitute "contents" within the meaning of 18 U.S.C. § 2510(8).

268. The third parties are not parties to the communications between Plaintiff and the Website. They are third-party interceptors that acquired the contents of Plaintiff's and Class Members' electronic communications through devices and processes embedded in the Website by Defendant.

269. Defendant did not obtain Plaintiff's or Class Members' consent for the interception and transmission of the contents of their electronic communications with the Website to third parties.

270. As a direct and proximate result of Defendant's violations of 18 U.S.C. section 2511, Plaintiff and the Content Interception Subclass have suffered injury and are entitled to recover the greater of actual damages or statutory damages of not less than $10,000 per violation, together with reasonable attorney's fees and other litigation costs reasonably incurred, pursuant to 18 U.S.C. section 2520.

/ / /

/ / /

## VIII. SECOND CAUSE OF ACTION

### Violations of Cal. Penal Code § 631 (Wiretapping)

### By Plaintiff and the Content Interception Subclass Against All Defendants

271. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except as to those allegations regarding claims based on Dialing, Routing, Addressing and Signaling information.

272. Plaintiff brings this cause of action individually and on behalf of the members of the Content Interception Subclass against Defendant.

273. During the relevant statute of limitations period, Defendant, by means of machines, instruments, or contrivances, and in an unauthorized manner, caused third parties to read, attempt to read, and learn the contents of electronic communications between Plaintiff and Class Members and the Website while those communications were in transit. The machines, instruments, or contrivances by which Defendant accomplished this interception are the Trackers, namely the Google Trackers, the Facebook Tracker, the Scarab Research Tracker, the Mountain Tracker, and the Pinterest Tracker.

274. Specifically, Defendant embedded and deployed the Trackers on the Website. The Trackers caused Plaintiff's and Class Members' browsers to transmit to the Third Parties operating the Trackers the Communication Contents (as defined in Paragraph 70) of Plaintiff's and Class Members' communications with the Website, including without limitation: plaintext product names and prices extracted from Website pages; the substantive content of search queries entered by Plaintiff and Class Members; structured product-content data, including product identifiers, descriptions, and ratings; page titles containing product names; identity-linked customer-match identifiers; and full-path URLs revealing the specific content Plaintiff and Class Members read or viewed. The transmissions occurred in real time, contemporaneously with the delivery of the Website's content to Plaintiff's and Class Members' browsers, and without Plaintiff's or Class Members' consent.

/ / /

275. The full-path URLs transmitted by the Trackers constitute the contents of Plaintiff's and Class Members' electronic communications with the Website because they reveal the substance of what Plaintiff and Class Members were reading, viewing, or engaging with on the Website, as distinguished from the routing, addressing, and signaling information necessary to facilitate the transmission of those communications.

276. The third parties are not parties to the communications between Plaintiff and the Website. Defendant willfully and without the consent of all parties to the communication caused these third parties to read and learn the contents of Plaintiff's and Class Members' communications while those communications were in transit.

277. Defendant did not obtain Plaintiff's or Content Interception Subclass Members' consent for the interception, reading, or learning of the contents of their electronic communications with the Website.

278. As a direct and proximate result of Defendant's violations of California Penal Code section 631, Plaintiff and the Content Interception Subclass have suffered injury and are entitled to recover the greater of five thousand dollars ($5,000) or three times the amount of actual damages sustained, pursuant to California Penal Code section 637.2(a).

## IX. <u>THIRD CAUSE OF ACTION</u>

**Violations of Cal. Penal Code § 638.51**

***By Plaintiff and the Class Members Against All Defendants***

279. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

280. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

281. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website

visitors.

282. The Trackers recorded Plaintiff and Class Members' dialing, routing, addressing, and signaling information in real time, automatically transmitting this dialing, routing, addressing and signaling data to multiple third-party ad-tech endpoints before the Webpage fully loaded.

283. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

## X. <u>FOURTH CAUSE OF ACTION</u>

### Violations of Cal. Constitution Article I § 1

***By Plaintiff and the Class Members Against All Defendants***

284. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

285. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

286. Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a private right of action against both governmental and private actors who engage in conduct that constitutes a serious invasion of privacy.

287. Plaintiff and the Class Members possess a legally protected privacy interest in the confidentiality of the substantive contents of their electronic communications with the Website, including without limitation: the contents of their search queries (including queries reflecting religious interests and beliefs); the substantive subject matter of pages they viewed (including product pages reflecting religious interests, such as the religiously-themed products viewed by Plaintiff during his California sessions); identity-linked customer-match identifiers transmitted by the Trackers to third-party advertising and identity-resolution platforms; and structured product-content data, including product

names, prices, descriptions, and identifiers, transmitted to third parties as discrete named payload parameters. Plaintiff and the Class Members further possess a legally protected privacy interest in the confidentiality of their communications metadata and identifying information, including IP address, browser details, session and persistent identifiers, page visit patterns, and clickstream behavior.

288. Plaintiff and the Class Members had a reasonable expectation that their activity on Defendant's website, including what pages were visited, what content was interacted with, and when, would not be secretly tracked and transmitted to third parties via embedded surveillance code.

289. Without Plaintiff's or the Class Members' knowledge or consent, Defendant caused the Trackers to be deployed on the Website. The Trackers secretly transmitted to the Third Parties operating the Trackers (a) the substantive contents of Plaintiff's and the Class Members' communications with the Website, including without limitation plaintext product names, plaintext product prices, search query strings, structured product-content data, page titles, full-path URLs revealing the specific content viewed, and identity-linked customer-match identifiers, and (b) dialing, routing, addressing, and signaling information, including IP addresses, referrer headers, timestamps, browser and device characteristics, and persistent identifiers, all of which together enabled the Third Parties to construct persistent cross-platform user profiles capable of identifying or re-identifying Plaintiff and the Class Members across sessions, devices, and contexts.

290. Defendant's conduct constitutes a serious and egregious invasion of Plaintiff's and the Class Members' informational privacy, far exceeding any routine or incidental data handling. The deployment of real-time surveillance tools designed to accomplish identity resolution and behavioral mapping is highly offensive to a reasonable person.

291. Defendant lacked any legitimate justification for failing to disclose or obtain consent for this data interception and transfer. The magnitude of the privacy

intrusion outweighed any speculative or commercial benefit to Defendant.

292. As a direct and proximate result of Defendant's actions, Plaintiff and the Class Members have suffered a loss of control over personal data, emotional distress, and a violation of their constitutional right to privacy.

## XI. <u>FIFTH CAUSE OF ACTION</u>

### Violations of Business & Professions Code § 17200

***By Plaintiff and the Class Members Against All Defendants***

293. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

294. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

295. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

296. Defendant has engaged in unlawful business practices by:

(a) Violating Article I, Section 1 of the California Constitution, which protects individuals from serious invasions of privacy; and

(b) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking.

297. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

298. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate

business justification.

299. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

300. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data. Plaintiff's and Class Members' data, used for targeted advertising, behavioral modeling, and enrichment by third parties, constitutes digital property with measurable economic value.

301. Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## XII. <u>SIXTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

***By Plaintiff and the Class Members Against All Defendants***

302. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

303. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for intrusion upon seclusion, a well-

established common law tort recognized in California, which protects individuals from intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

304. At all relevant times, Plaintiff and the Class Members had an objectively reasonable expectation of privacy in the substantive contents of their communications with the Website, including the contents of their search queries, the specific products and pages they viewed, and identity-linked information about themselves transmitted alongside that content, and in their online browsing activity more generally, including session timestamps, click paths, and form entries. Plaintiff did not by his conduct manifest a voluntary consent to Defendant's actual data-collection, interception, and disclosure practices, which Defendant did not adequately or specifically disclose, and to which neither Plaintiff nor a reasonable user would have consented had they been disclosed.

305. Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. The Trackers were engineered to surreptitiously capture and transmit to the Third Parties operating the Trackers (a) the substantive contents of Plaintiff's and Class Members' communications with the Website, including plaintext product names, plaintext product prices, search query strings, structured product-content data, page titles, full-path URLs revealing the specific content viewed, and identity-linked customer-match identifiers, and (b) granular behavioral and routing data including IP addresses, URL paths, referrer headers, timestamps, device attributes, and persistent identifiers.

306. The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

307. Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous

disclosure of this surveillance, nor did it obtain affirmative consent from Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

308. The nature of this covert surveillance, especially its capacity to link online activity to identifiable users, would be highly offensive to a reasonable person, particularly in light of growing public sensitivity to privacy rights and digital surveillance.

309. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered an invasion of privacy, loss of control over personal information, and emotional harm, including anxiety, indignity, and concern over being unknowingly tracked, profiled, and exposed to targeted advertising based on private digital conduct.

310. Defendant's conduct was willful, malicious, and oppressive, thereby justifying the imposition of punitive and exemplary damages.

## XIII. SEVENTH CAUSE OF ACTION

### Unjust Enrichment

***By Plaintiff and the Class Members Against All Defendants***

311. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

312. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for unjust enrichment, asserting that Defendant has been unjustly enriched through the unauthorized and uncompensated acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

313. Plaintiff and the Class Members, while visiting and interacting with the Website, unknowingly conferred a substantial benefit on Defendant by generating digital behavioral data, including but not limited to IP address, device information, browser metadata, URL paths, session timestamps, and interaction signals.

314. Defendant deployed the Trackers without Plaintiff's and Class Members' knowledge or meaningful consent. The data collected was then used by Defendant and/or

third parties to conduct behavioral targeting, analytics, and advertising optimization that generated substantial financial value.

315. At no time did Plaintiff and Class Members consent to the commercial exploitation of this data. Nor was Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment conferred upon Defendant.

316. Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed, and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this asset without disclosure or fair exchange renders its conduct unjust.

317. Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class and the Content Interception and Pen Register Subclasses, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates 18 U.S.C. § 2511, California Penal Code § 631, California Penal Code § 638.51, the California Constitution, and Business & Professions Code § 17200;
3. An order declaring that Defendant's conduct unlawfully intrudes upon the seclusion of Plaintiff and the Class Members;
4. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;
5. An order enjoining Defendant's conduct as alleged herein;

6. Disgorgement of profits resulting from unjust enrichment;
7. Statutory damages pursuant to 18 U.S.C. § 2520;
8. Statutory damages pursuant to California Penal Code § 637.2;
9. Prejudgment interest;
10. Reasonable attorney's fees and costs, including pursuant to 18 U.S.C. § 2520; and
11. All other relief that would be just and proper as a matter of law or equity.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: May 4, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*