Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SALEEM ERAKAT

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SALEEM ERAKAT, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>HOBBY LOBBY STORES, INC., an Oklahoma corporation,<br><br>Defendants. | Case No: 4:26-cv-00323-HSG<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Date: August 27, 2026<br>Time: 2:00 p.m.<br>Courtroom: 2<br>Judge: Hon. Haywood S. Gilliam, Jr.<br><br>Complaint Filed: January 12, 2026<br>Trial Date: None Set |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. RELEVANT ALLEGATIONS .......... 2

III. LEGAL STANDARD .......... 2

IV. ARGUMENT .......... 3

1. PLAINTIFF HAS ARTICLE III STANDING. .......... 3

A. The interception of the content of Plaintiff's religion-related communications is a concrete injury with a close common-law analogue. .......... 3

B. Plaintiff also alleges a concrete economic injury that does not depend on any expectation of privacy. .......... 5

C. Defendant's metadata authorities confirm the line and fall on the other side of it. .......... 6

D. The "tester" argument does not defeat standing. .......... 6

E. The FAC adequately alleges Plaintiff's own religion-themed use of the Website. .......... 8

2. PLAINTIFF STATES A CLAIM UNDER CIPA § 631. .......... 9

A. The third parties are non-exempt eavesdroppers, and Defendant is liable under the fourth clause for aiding them. .......... 10

B. The FAC adequately alleges that the contents were read in transit. .......... 11

C. The trackers captured "contents," not mere record information. .......... 14

D. The derivative third- and fourth-clause theories follow. .......... 15

3. CONSENT DOES NOT BAR PLAINTIFF'S CLAIMS. .......... 15

4. PLAINTIFF PRESERVES THE FEDERAL WIRETAP ACT CLAIM (18 U.S.C. § 2511). .......... 17

5. PLAINTIFF STATES CONSTITUTIONAL PRIVACY AND INTRUSION CLAIMS. .......... 18

6. PLAINTIFF STATES A UCL CLAIM. .......... 19

7. PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT. .......... 20

8. PLAINTIFF STATES A CLAIM UNDER CIPA § 638.51. .......... 20

V. CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ....................20

*Briskin v. Shopify Inc.*,
No. 21-cv-06269-PJH, 2026 WL 161441,
2026 U.S. Dist. LEXIS 11317 (N.D. Cal. Jan. 21, 2026)....................5, 11, 13, 14, 19

*Carolus v. Nexstar Media Inc.*,
No. 24-CV-07790-VC, 2025 WL 1338193,
2025 U.S. Dist. LEXIS 92707 (N.D. Cal. Apr. 9, 2025) ....................1, 6

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) ....................11

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) ....................11

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ....................20

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................14, 18

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ....................7

*Hazel v. Prudential Financial, Inc.,*
No. 22-cv-07465-CRB, 2023 WL 3933073,
2023 U.S. Dist. LEXIS 100974 (N.D. Cal. June 9, 2023) ....................14

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................4, 5, 9, 10, 12, 13, 14, 17, 18, 20

*In re Google Inc. Gmail Litig.*,
No. 13-MD-02430-LHK, 2013 WL 5423918,
2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) ....................13

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................18

*In re Pharmatrak, Inc. Privacy Litig.*,
329 F.3d 9 (1st Cir. 2003)....................13

Javier v. Assurance IQ, LLC,
649 F. Supp. 3d 891 (N.D. Cal. 2023)....................11, 16

*Javier v. Assurance IQ, LLC*,
No. 21-16351, 2022 WL 1744107,
2022 U.S. App. LEXIS 14951 (9th Cir. May 31, 2022)....................16

*Ji v. Naver Corp.*,
No. 21-cv-05143-HSG, 2023 WL 6466211,
2023 U.S. Dist. LEXIS 178311 (N.D. Cal. Oct. 3, 2023) ....................2, 5, 14, 15, 19, 20

*Khamooshi v. Politico LLC,*
786 F. Supp. 3d 1174 (N.D. Cal. 2025)....................1, 4, 6

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ....................17

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ....................12

*Krzyzek v. OpenX Technologies, Inc.,*
817 F. Supp. 3d 857 (N.D. Cal. 2026)....................14

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ....................3

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ....................3

*Mitchener v. CuriosityStream, Inc.*,
815 F. Supp. 3d 845 (N.D. Cal. 2025)....................20

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................1, 4, 5, 6

*R.C. v. Sussex Publrs., LLC*,
No. 24-cv-02609-JSC, 2025 WL 948060,
2025 U.S. Dist. LEXIS 59491 (N.D. Cal. Mar. 28, 2025) ....................9, 10, 13, 18, 19

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) .......... 14

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) .......... 14

*Rodriguez v. Autotrader.com, Inc.*,
No. 2:24-CV-08735-RGK-JC, 2025 WL 1085787,
2025 U.S. Dist. LEXIS 70074 (C.D. Cal. Apr. 4, 2025) .......... 6

*Sunga v. NAVER Corp.*,
No. 21-cv-05143-HSG, 2026 WL 1102870, 2026 U.S. Dist. LEXIS
90308 (N.D. Cal. Apr. 23, 2026) .......... 19

*Tavernetti v. Superior Court*,
22 Cal. 3d 187 (1978) .......... 9

*Taylor v. ConverseNow Techs., Inc.*,
No. 25-cv-00990-SI, 2025 WL 2308483,
2025 U.S. Dist. LEXIS 154861 (N.D. Cal. Aug. 11, 2025) .......... 9

*Torres v. Prudential Fin., Inc.*,
No. 22-cv-07465 (CRB), 2025 WL 1135088,
2025 U.S. Dist. LEXIS 73736 (N.D. Cal. Apr. 17, 2025) .......... 11, 13

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 3

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) .......... 13

*Williams v. Facebook, Inc.*,
384 F. Supp. 3d 1043 (N.D. Cal. 2018) .......... 18

**Rules And Statutes**

18 U.S.C. § 2511 .......... 1, 17, 20

18 U.S.C. § 2511(2)(d) .......... 17

Cal. Penal Code § 631 .......... 1, 17, 20

Cal. Penal Code § 631(a) .......... 9

Cal. Penal Code § 638.51 .......... 1, 20

CIPA .......... 6, 9, 19

Fed. R. Civ. P. 12(d) ....17
Fed. R. Civ. P. 15(a)(2) ....17, 21

**Other Authorities**

California Constitution ....19, 21

# I. INTRODUCTION

Defendant's Motion to Dismiss (Dkt. 34, "MTD") succeeds only by recharacterizing this case as one the First Amended Complaint (Dkt. 27, "FAC") does not plead. Plaintiff does not contend that the routine collection of IP addresses, timestamps, browser strings, or referrer paths is, standing alone, a privacy harm, or that every technical identifier independently confers standing. The injury at the core of his claims is narrower and more serious: Defendant caused third-party advertising and identity-resolution companies to receive the substance of his communications with the Website, including religion-related content, without his consent.

The FAC's structure answers the refrain that Plaintiff "cannot have it both ways." It pleads two non-overlapping categories of data: (i) the contents of Plaintiff's communications (his search queries and the names, descriptions, and details of the products he viewed), which support the wiretap claims under California Penal Code § 631 and 18 U.S.C. § 2511 and the related privacy claims; and (ii) separate, non-content dialing, routing, addressing, and signaling ("DRAS") data, which support the pen-register claim under § 638.51. No data element is pleaded as both. (FAC ¶¶ 67-70.) The content claims rest on content, and the pen-register claim rests on non-content DRAS.

The nature of the information collected governs the motion. Defendant's lead authority, *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025), involved ordinary, nonsensitive session-replay data including product-page URLs that did not reveal personal subject matter interests like Plaintiff's religion-themed queries did in the instant case. Likewise, *Khamooshi v. Politico LLC,* 786 F. Supp. 3d 1174 (N.D. Cal. 2025), *Carolus v. Nexstar Media Inc.*, No. 24-CV-07790-VC, 2025 WL 1338193, 2025 U.S. Dist. LEXIS 92707 (N.D. Cal. Apr. 9, 2025), and Defendant's other authorities principally concern IP addresses, device information, or routine analytics. Such authorities do not control a case pleaded around the third-party interception of the actual contents of Plaintiff's particularly sensitive communications, search queries and other content. This Court drew that same line in *Ji*: claims based on the interception of actual

communication content survived, while privacy claims based merely on "data about content" did not. *Ji v. Naver Corp.*, No. 21-cv-05143-HSG, 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *28-29 (N.D. Cal. Oct. 3, 2023).

Defendant's motion tries to force Plaintiff's content-interception claims into a routine-metadata box. It disputes that the FAC pleads the religious searches as Plaintiff's own, and otherwise treats the interception of his religion-related content as if it were ordinary analytics, never grappling with why the interception of Plaintiff's religious search queries, expressions of faith rather than ordinary shopping, is different in kind from the non-sensitive product-browsing in *Popa*: it is the sensitive circumstance *Popa* itself set apart from the non-sensitive data before it.

## II. RELEVANT ALLEGATIONS

Plaintiff Saleem Erakat is a California resident who accessed Defendant's Website from within California on multiple occasions during the class period. (FAC ¶¶ 19, 33.) During his California sessions he conducted product searches, viewed product-detail pages, including product pages reflecting religion-related interests, and used the Website's store-locator to find the Hobby Lobby store nearest his residence. (FAC ¶¶ 19, 33, 287.) Defendant had embedded third-party tracking software on the Website that, upon page load, caused Plaintiff's browser to transmit to the third parties both (i) non-content dialing, routing, addressing, and signaling ("DRAS") information and (ii) the substantive contents of his communications, including the contents of his search queries (including queries reflecting religion-related interests) and structured product-content data (religiously-themed product names, descriptions, and prices) conveyed as discrete named payload parameters. (FAC ¶¶ 33-34, 67-70, 287.) The FAC alleges these transmissions occurred automatically, in real time, contemporaneously with Plaintiff's communications, and before the requested pages finished loading or became visible. (FAC ¶¶ 34, 108-109, 115, 211.)

## III. LEGAL STANDARD

On a Rule 12(b)(1) facial attack, the Court accepts the complaint's allegations as

true and draws all reasonable inferences in the plaintiff's favor. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). On Rule 12(b)(6), the Court accepts well-pleaded facts as true and asks whether they state a plausible claim, construing the pleading in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Where two readings of an allegation are available, the Court adopts the one favorable to the nonmoving party. *Id.*

## IV. ARGUMENT

### 1. PLAINTIFF HAS ARTICLE III STANDING.

Plaintiff need not establish that the collection of bare IP addresses, browser strings, timestamps, referrer paths, or generic page-view analytics, standing alone, creates a cognizable injury. The concrete privacy injury alleged is the third parties' receipt of the substance of the religion-related search and product-content communications Plaintiff transmitted during his California-located sessions, linked to persistent identifiers and disclosed without valid prior consent. (FAC ¶¶ 33, 287.) Standing follows from two independent, judicially recognized harms: the interception and disclosure of sensitive communication content and the injury resulting from the unauthorized collection and monetization of Plaintiff's data.

#### A. The interception of the content of Plaintiff's religion-related communications is a concrete injury with a close common-law analogue.

To determine whether an intangible harm is concrete, courts assess whether it bears a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts; that inquiry asks whether the plaintiff has identified a close historical or common-law analogue, not an exact duplicate. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). The unauthorized interception of the contents of a communication bears such a relationship to the historically recognized harm of eavesdropping and intrusion into private communications, a tradition reinforced by state and federal wiretap statutes. Third-party dissemination is also significant under

*TransUnion*, though that case involved false credit reports and a defamation analogue. *Id.* at 432-34.

Here we have a closer analogue than the shopper-observation comparison the *Popa* panel applied to the nonsensitive, single-site session-replay data alleged there, where the court likened the monitoring to "a store clerk's observing shoppers" to identify popular store aisles and spot potential sales disruptions, neither of which implicate anything sensitive, and did not analyze an eavesdropping or interception analogue at all. *Popa,* 153 F.4th at 791. *Popa* nonetheless recognized that tracking *can be* offensive where sensitive information is involved. *Id.* at 791-92. *Khamooshi* likewise distinguished claims involving only IP addresses and device data from allegations concerning search terms and visits to websites relating to sensitive issues like race, religion, sexual orientation, and health. *Khamooshi*, 786 F. Supp. 3d at 1178, 1180-81 & n.4.

*In re Facebook* is directly on point. There, third-party tracking that compiled users' browsing into "cradle-to-grave profile[s]" potentially including "religious affiliations" without consent established a concrete privacy injury. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598-99 (9th Cir. 2020). That is this case: third-party trackers received the substance of Plaintiff's religion-related communications and linked that content to persistent identifiers for identity resolution, cross-platform profiling, and advertising monetization. (FAC ¶¶ 2-3, 6, 10-11, 14, 55, 134, 138, 200, 213, 225, 240, 252, 254, 287.) That the harm arises from a single website does not move the case toward *Popa*: the cross-site profiling that makes the injury concrete is the third parties' doing, and the FAC pleads it directly, alleging that the recipients are "identity-resolution companies" (FAC ¶ 26) that aggregate the data with information "collected from users' interactions on other websites and applications" to build "cross-site user profiles" used "to track Plaintiff and Class Members across the Internet" (FAC ¶ 16) and to compile a "persistent cross-platform profile of Plaintiff" (FAC ¶¶ 31, 35, 68, 250). That is the cradle-to-grave dissemination *In re Facebook* found sufficient, not a retailer's

internal observation of preferred store aisles to gain insight into sales disruptions on a single visit. *Popa* involved no allegation that the defendant disclosed the plaintiff's content to cross-site identity-resolution firms, and it declined to revisit *In re Facebook*, distinguishing it from the nonsensitive session-replay data there. *In re Facebook*, 956 F.3d at 598-99; *Popa,* 153 F.4th at 791, 794-95.

Courts in this District and the Ninth Circuit accordingly sustain privacy and wiretap claims at the pleading stage where third parties intercept the contents of communications and compile cross-site browsing into identifiable profiles. See *In re Facebook*, 956 F.3d at 596-99, 607-08; *Ji*, 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *28-32 (distinguishing actual communication content from data about content).

**B. Plaintiff also alleges a concrete economic injury that does not depend on any expectation of privacy.**

Independently, Plaintiff alleges an economic injury. Under *In re Facebook*, "California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable," and that interest "exists regardless of whether an individual planned to sell his or her data." *In re Facebook,* 956 F.3d at 600. This Court applied that principle in *Ji*, 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *17-19, and *Briskin* recognized the same logic, observing that a monetary-loss requirement would be "akin to having a 'peeping tom' statute with a 'pecuniary loss' requirement," *Briskin v. Shopify Inc.*, No. 21-cv-06269-PJH, 2026 WL 161441, 2026 U.S. Dist. LEXIS 11317, at *22-24, 26 (N.D. Cal. Jan. 21, 2026) (dismissing with leave to amend for insufficient factual allegations). Here, Plaintiff's economic injury rests on that disgorgement theory, which does not turn on market participation or out-of-pocket loss; the FAC separately alleges that his browsing data has measurable economic value (FAC ¶ 124) and that Defendant deprived him of control over its disclosure. Either interest supports standing.

### C. Defendant's metadata authorities confirm the line and fall on the other side of it.

*Popa* involved non-sensitive session-replay data, and *Khamooshi* and *Carolus* involved device-level data such as IP addresses; none involved sensitive, substantive human-readable content comparable to the religious-related personal browsing alleged here. *Khamooshi* dismissed a claim in which IP addresses were the only specifically identified data, while distinguishing cases involving "information implicating a protectable privacy interest," including browsing histories and sensitive search terms. *Khamooshi*, 786 F. Supp. 3d at 1181-82 & n.4. *Carolus* likewise dismissed a claim centered on IP addresses while distinguishing *In re Facebook* and *In re Google RTB*, which involved several types of personal information and the "content of those sites." *Carolus*, 2025 WL 1338193, 2025 U.S. Dist. LEXIS 92707, at *3. None reaches a case pleaded, as this one is, on the interception of sensitive, substantive content in human readable terms linked to persistent identifiers and used for cross-site profiling.

### D. The "tester" argument does not defeat standing.

Defendant's reliance on *Rodriguez v. Autotrader.com, Inc.*, No. 2:24-CV-08735-RGK-JC, 2025 WL 1085787, 2025 U.S. Dist. LEXIS 70074 (C.D. Cal. Apr. 4, 2025), is misplaced. *Rodriguez* is a decision from another district that dismissed a tester's CIPA claim for lack of standing on the ground that invasions of privacy "depend on the plaintiffs reasonable expectations," such that a tester who "expect[ed] the information to be accessed, recorded, and disclosed … cannot claim an injury when her expectations were ultimately met." *Id.* at *3. The court distinguished the tester standing authorities before it, which were First Amendment and ADA cases, as ones in which "the plaintiffs were injured regardless of their expectations or intentions." *Id.*

That reasoning does not reach the injury alleged here. *Rodriguez* dismissed a § 638.51 pen-register claim premised on non-content metadata, where the tester had no reasonable expectation of privacy. Plaintiff's claim under the second clause of § 631 is different in kind: the unauthorized interception of the *contents* of a communication, a

statutory injury complete upon interception that does not turn on what Plaintiff anticipated. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982), a tester had standing because the statutory violation was itself the injury the Act forbade and the tester's expectation of it, and lack of intent to rent, "d[id] not negate the simple fact of injury." Here, the injury under the second clause of § 631 is the unauthorized interception of the contents of a communication, an injury that does not depend on the plaintiff's expectations. The relevant inquiry is the objective nature of the information intercepted and the resulting harm, not Plaintiff's litigation motive.

Furthermore, Defendant's attempt to rebrand Plaintiff as a "tester" is rhetoric, not fact: the FAC alleges ordinary consumer use. Plaintiff is a California consumer who, as the FAC alleges, searched for and viewed religion-related content, including religiously themed product pages, and used the Website's store-locator to find the Hobby Lobby nearest his home. (FAC ¶¶ 19, 33, 287.) And because Plaintiff's economic-injury theory (Part IV.1.B) does not depend on any expectation of privacy, the tester label cannot defeat standing.

Defendant's factual premise is also flawed, as it conflates the recording of a transmission with its cause. The diagnostic tools Defendant names, Chrome DevTools, Wireshark, and Fiddler, do not generate the challenged third-party requests; Defendant's own embedded code does. The Trackers transmit Plaintiff's communications to the third parties automatically whenever the Website is accessed, whether or not any diagnostic tool is running. A proxy that decrypts and records HTTPS traffic captures requests the browser already makes; it does not manufacture them. Treating the instrument used to observe a transmission as the cause of that transmission is like treating a camera as the cause of the event it records. The demonstrative captures reproduced in the FAC, moreover, were generated in counsel's pre-filing investigation to document the Website's operation, not by Plaintiff; counsel's later documentation does not convert Plaintiff's ordinary use of the Website into a manufactured injury.

/ / /

### E. The FAC adequately alleges Plaintiff's own religion-themed use of the Website.

The FAC pleads Plaintiff's own religion-related use directly. It alleges that "[o]n multiple occasions during the class period Plaintiff accessed the Website from within California and engaged in browsing activity, including conducting product searches, reading articles, and viewing product detail pages," and that "[d]uring each of those California-located sessions" Defendant caused Plaintiff's browser to transmit to the Third Parties the contents of his communications, including "the URL of the search-results pages Plaintiff viewed" and "the URL and product name of the product detail pages Plaintiff viewed." (FAC ¶ 33.) Those transmissions, the FAC alleges, "are the conduct out of which Plaintiff's claims arise." (FAC ¶ 33.)

The pages Plaintiff viewed included religious subject matter. The FAC alleges that Plaintiff possesses a legally protected privacy interest in "the substantive subject matter of pages they viewed (including product pages reflecting religious interests, such as the religiously-themed products viewed by Plaintiff during his California sessions)," and in "the contents of [his] search queries (including queries reflecting religious interests and beliefs)." (FAC ¶ 287.) Defendant brands ¶ 287 "conclusory," but its operative words allege what Plaintiff did, not a legal conclusion: these were "the religiously-themed products viewed by Plaintiff during his California sessions." That factual allegation must be credited.

Those allegations do not stand alone. The FAC identifies, field by field, the religion-related content the Trackers transmitted during Website sessions: the search queries "jesus" and "jesus saves," conveyed as discrete named payload parameters and within the search-results URLs "search?query=jesus" and "search?query=jesus%20saves," together with the names and descriptions of religiously-themed products such as the "Jesus Walking On Water Framed Canvas Wall Decor." (FAC ¶¶ 13, 210, 223, 252.) A search query is not a product. To type "jesus" and "jesus saves" is to express religious faith and belief, not to select an item that happens to bear

a religious name; the FAC describes these queries as "reflecting religious interests and beliefs." (FAC ¶ 287.) What the Trackers intercepted and disclosed to third parties was thus the substance of Plaintiff's religious expression, linked to a persistent identity. Read together with ¶¶ 33 and 287, and drawing the inferences required in Plaintiff's favor, these allegations plausibly establish that Plaintiff's own California browsing included the religion-related searches and products whose transmitted contents the FAC describes in detail.

Defendant's contrary reading would require the Court to isolate ¶ 287 from the Complaint, disregard a well-pleaded factual allegation, and resolve the resulting inference against Plaintiff at the pleading stage, which it may not do.

**2. PLAINTIFF STATES A CLAIM UNDER CIPA § 631.**

Section 631(a) proscribes three distinct, mutually independent patterns of conduct, including the second clause, which prohibits reading or learning the contents of a communication in transit, and imposes derivative liability through a fourth clause on anyone who aids, agrees with, employs, or conspires with another to commit any of the prohibited acts. *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 191-92 & n.1 (1978); Cal. Penal Code § 631(a); see *Taylor v. ConverseNow Techs., Inc.*, No. 25-cv-00990-SI, 2025 WL 2308483, 2025 U.S. Dist. LEXIS 154861, at *6-7 (N.D. Cal. Aug. 11, 2025).

Courts recognize that a website operator may face CIPA aiding liability for deploying third-party tools that capture or record users' communications. *R.C. v. Sussex Publrs., LLC*, No. 24-cv-02609-JSC, 2025 WL 948060, 2025 U.S. Dist. LEXIS 59491, at *24-28 (N.D. Cal. Mar. 28, 2025) (sustaining a § 632 aiding claim based on the operator's embedding of third-party code that shared users' data). And the predicate is well established: such third-party tools are non-exempt interceptors of communication contents. *See In re Facebook*, 956 F.3d at 607-08; *Taylor*, 2025 WL 2308483, 2025 U.S. Dist. LEXIS 154861, at *13-17.

/ / /

**A. The third parties are non-exempt eavesdroppers, and Defendant is liable under the fourth clause for aiding them.**

The party exemption protects only a party's listening to its own communications; it does not immunize a third party that surreptitiously intercepts the communication, nor a party that aids such interception. In *In re Facebook*, the Ninth Circuit held that an entity "that surreptitiously duplicate[s] transmissions between two parties" is not a party and is not exempt, declining to follow "the intended recipients" theory that would treat the Trackers as parties. *In re Facebook*, 956 F.3d at 607-08. The mechanism the panel described (the browser sends the third party a separate but identical copy of the request through a "separate, but simultaneous, channel"), *id.* at 596, 606-07*,* is precisely the mechanism alleged here. (FAC ¶¶ 114-115.) Google, Meta, MNTN, and Pinterest are therefore non-exempt third parties.

A party's liability for aiding a non-party's interception is settled, and it answers Defendant's footnote that Plaintiff sued only Hobby Lobby. In *R.C. v. Sussex Publishers*, the website operator was the sole defendant, and the parties treated it as a party to the communications that could not directly eavesdrop under § 632. The court nevertheless sustained the § 632 aiding claim on allegations that the operator embedded Google Analytics code and thereby shared users' IP addresses and medical information with Google, satisfying the aiding-and-abetting standard's substantial assistance. *R.C. v. Sussex*, 2025 WL 948060, 2025 U.S. Dist. LEXIS 59491, at *27-28. The parallel § 631 aiding claim was dismissed with leave to amend on the grounds that the complaint did not plausibly allege that Google read the information while it was in transit. *Id.* at *22-23; *see* section IV.2.B below. Plaintiff alleges the same conduct: Defendant knowingly deployed and maintained the Trackers, aiding and employing the third parties to read the contents of users' communications. (FAC ¶¶ 11, 56, 273-74.)

Nor is this novel. *Javier* and *Cody* apply the same capability test: a software vendor is not a mere tool but may be treated as a non-exempt third party where it is capable of using the intercepted communications for its own purposes. *Javier v.*

*Assurance IQ, LLC*, 649 F. Supp. 3d 891, 897-901 (N.D. Cal. 2023) (plaintiff plausibly alleged that ActiveProspect is a third party under Section 631 where the vendor has the capability to use its record of the interaction for any other purpose); *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1002-1004 (N.D. Cal. 2024) (recognizing that a vendor which used the data for its own benefit is a non-exempt third party, unlike the tool in *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021), but dismissing with leave where the independent-use allegations were generalized and vague).

To defeat the party-exemption defense a plaintiff "need only show that the software vendor is capable of using the data it collects for some other purpose," not that it "actually did so." *Torres v. Prudential Fin., Inc.*, No. 22-cv-07465 (CRB), 2025 WL 1135088, 2025 U.S. Dist. LEXIS 73736, at *9 (N.D. Cal. Apr. 17, 2025) (citing *Javier*); accord *Briskin*, 2026 WL 161441, 2026 U.S. Dist. LEXIS 11317, at *17. That is what the FAC pleads as to Google, Meta, MNTN, and Pinterest: the third parties use the intercepted content for their own independent commercial purposes, including identity resolution, cross-platform profiling, advertising measurement, and audience targeting. (FAC ¶¶ 14, 55, 200, 213, 240, 254.)

**B. The FAC adequately alleges that the contents were read in transit.**

The FAC pleads a specific sequence that places the interception during transmission, and it must be credited. On the FAC's allegations, situated in the ordinary sequence of a page load, the interception occurs in this order: (1) Plaintiff's browser requests the page; (2) Hobby Lobby begins transmitting the HTTP response; (3) the browser progressively parses the HTML as the bytes arrive; (4) Defendant's embedded JavaScript executes during that parsing, "automatically upon page load and navigation" and before the page "finished rendering" (FAC ¶¶ 8, 211); (5) the search terms and product content populate named payload fields (FAC ¶¶ 34, 108-109); (6) the browser simultaneously sends duplicate requests carrying that content to the third parties "in real time, contemporaneously with the delivery of the Website's content" (FAC ¶¶ 273-274);

(7) rendering continues; and (8) the page becomes visible.

The interception occurs while the communication is still in transit and "before the requested pages finished loading or became visible" (FAC ¶ 115), not after a completely loaded page has come to rest. And the communications run in both directions. Plaintiff's search queries are communications to Hobby Lobby, and the product names, descriptions, and prices on the requested pages are communications from Hobby Lobby to Plaintiff's browser. In both directions, Defendant's embedded code causes the browser to transmit a contemporaneous copy of those contents to the third parties as part of the same page-load transaction (FAC ¶¶ 34, 68, 108-109, 211), so the third parties acquire a duplicate of each communication, not a new message composed after page load concluded. That is interception "in transit": as the Ninth Circuit explained in *In re Facebook*, embedded code may send user data to a third party through a "separate, but simultaneous, channel" and may direct the browser to send a "separate but identical" request. *In re Facebook*, 956 F.3d at 596, 606-07.

Defendant's contrary argument depends on equating "rendered" with "come to rest" (MTD at 15-16) but those terms are not equivalent, and the FAC's own timing allegations refute the equation. The FAC alleges that the interception occurs "before the requested page has finished rendering" (FAC ¶ 211) and "before the requested pages finished loading or became visible" (FAC ¶ 115). Browsers render progressively, executing embedded scripts while the page is still being built, so the FAC's separate reference to content "extracted from the rendered page" (FAC ¶¶ 68, 109, 210) describes content captured as the page renders, not content read from a finished, at-rest page. That phrase, moreover, identifies the source and character of the data, not the timing of the reading (FAC ¶¶ 67-70). At the pleading stage, the favorable reading controls.

Nor is there an electronic-storage problem, or any significance to the fact that the code runs on the user's device. Under *Konop v. Hawaiian Airlines, Inc.*, an electronic communication is intercepted when acquired during transmission, not while it is in electronic storage. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).

The FAC alleges the former: automatic, page-load-triggered duplication in real time, not access to a stored repository. Client-side execution during page load is the very mechanism of that contemporaneous duplication, not evidence against it; as *In re Facebook* explains, embedded code causes the browser to transmit the data through a "separate, but simultaneous, channel." *In re Facebook,* 956 F.3d at 596, 606-07; see *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2013 WL 5423918, 2013 U.S. Dist. LEXIS 172784, at *7, *33-46 (N.D. Cal. Sept. 26, 2013) (denying dismissal where Google acquired email content while in transit).

Defendant contends that the tracker requests are "new, separately addressed communications for which the Third Party is the intended recipient, not an interception of the original" (MTD at 15). That is wrong. The law does not require that the third party seize the only copy of the communication. *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 21-22 (1st Cir. 2003) (duplication that was "contemporaneous with the transmission by the internet users to the pharmaceutical companies" was an interception, and "[s]eparate, but simultaneous and identical, communications satisfy even the strictest real-time requirement"); accord *United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010). *In re Facebook* adopted that reasoning, holding that simultaneous, unknown duplication does not exempt the duplicating third party under the party exception. *In re Facebook*, 956 F.3d at 607-08.

Defendant's own authorities confirm the timing distinction and do not control. *Torres* was decided on summary judgment, and the § 631 claim failed because the record did not show that the third party read the contents in transit. *Torres,* 2025 WL 1135088, 2025 U.S. Dist. LEXIS 73736, at *14-19. *Briskin* and *R.C.* dismissed in-transit theories only with leave to amend, after concluding the complaints did not adequately describe the data as read in transit. *Briskin,* 2026 WL 161441, 2026 U.S. Dist. LEXIS 11317, at *18-20; *R.C. v. Sussex,* 2025 WL 948060, 2025 U.S. Dist. LEXIS 59491, at *20-23. The FAC here expressly alleges contemporaneous reading during the page-load process, and Plaintiff may develop the supporting technical evidence in discovery.

Courts in this District confirm that, on materially similar allegations, the in-transit question is factual and not resolvable on the pleadings. In *Riganian v. LiveRamp Holdings, Inc.*, the court denied dismissal because allegations that the tracker intercepts communications before they reach the webpage "plausibly allege[d] real-time interception and contemporaneous reading within the meaning of § 631(a)," and it held the defendant's contrary technological account "better left for summary judgment." *Riganian v. LiveRamp Holdings, Inc.,* 791 F. Supp. 3d 1075, 1092 (N.D. Cal. 2025). So too in *Krzyzek v. OpenX Technologies, Inc.*, where allegations that a pixel "intercepts the detailed, full-string URL from each page" within seconds of the visit "plausibly alleged interception in transit." *Krzyzek v. OpenX Technologies, Inc.,* 817 F. Supp. 3d 857, 868-69 (N.D. Cal. 2026). And *Hazel v. Prudential Financial, Inc.* held that whether the tracker intercepted the data before or after storage "is a question for summary judgment." *Hazel v. Prudential Financial, Inc.,* No. 22-cv-07465-CRB, 2023 WL 3933073, 2023 U.S. Dist. LEXIS 100974, at *9-10 (N.D. Cal. June 9, 2023). This Court reached the same result in *Ji*, crediting allegations that the defendants intercepted communications "while such messages . . . were in transit." *Ji*, 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *31-32.

**C. The trackers captured "contents," not mere record information.**

The named payload fields the trackers transmit (Plaintiff's religious search terms such as "jesus," and related product names, descriptions, and prices) are the substance of the communication, not mere routing metadata. *Briskin* rejected the contrary argument as "too far-sweeping," explaining that "the 'contents' of an online purchase are essentially (1) the product information, and (2) the payment information." *Briskin,* 2026 WL 161441, 2026 U.S. Dist. LEXIS 11317, at *18. Accord *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092-1093 (N.D. Cal. 2022) (URLs are contents "when they reproduce a person's personal search engine queries"); *In re Facebook*, 956 F.3d at 605 (recognizing that search-term URLs "could divulge a user's personal interests, queries, and habits"); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) ("URLs

which disclose search terms that reveal website users' 'personal interests, queries, and habits' are 'contents' . . . under CIPA and ECPA"). Plaintiff's search-query URLs (e.g., search?query=jesus) and descriptive product-page URLs fall squarely within that rule and within this Court's content/data about content line in *Ji*.

**D. The derivative third- and fourth-clause theories follow.**

The FAC adequately alleges that the third parties read the contents of communications in transit (the second-clause predicate); the derivative theories (Defendant's aiding of that conduct and the use of information) stand with it.

**3. CONSENT DOES NOT BAR PLAINTIFF'S CLAIMS.**

Consent is an affirmative defense on which Defendant bears the burden, and it cannot be established on a motion to dismiss. The FAC alleges that the Website displayed no consent banner, pop-up, or cookie notice (FAC ¶ 17), and that "[n]o disclosure, banner, or mechanism alerted Plaintiff" that the content of his communications was being transmitted to third parties (FAC ¶ 114). On a Rule 12(b)(6) motion those allegations are taken as true, and they defeat the defense.

Defendant's primary theory advises the Court that Plaintiff was presented with, saw and accepted a consent banner. Defendant represents that "the Website's cookie banner, presented when users enter the Website," disclosed its tracking (MTD at 10); that "these disclosures appear before a user can enter any content" (MTD at 10); and that this "defeat[s] any claim that Plaintiff was unaware of, or did not consent to, the challenged practices" (MDT at 10). Each is a representation of so-called fact about what this Plaintiff encountered on entering the Website; none of it is supported.

This is a putative class of California residents (FAC ¶ 1), and Plaintiff accessed the Website from within California (FAC ¶ 33); yet nowhere, not in its brief, its declaration, or its request for judicial notice, does Defendant represent that the cookie banner is shown to any California visitor, or that it was ever shown to Plaintiff. Defendant's only support is Plaintiff's own Figure 9, which Defendant itself calls "a capture reflecting the Google Tag Manager," (MTD at 9) and which Plaintiff offered

solely to show Google's tracking infrastructure firing on page load (FAC ¶ 190).

Defendant designed, deployed, and controls its own consent-management platform, and it alone determines whether a California visitor is shown a banner. Its silence on that question is not a gap in the record but a choice: Defendant declines to evidence the single fact within its control on which its defense depends. To assert as an established fact that this California Plaintiff saw and accepted a banner, while withholding the true configuration by the Defendant that confirms no California visitor is presented with a consent banner at all, is disingenuous. The FAC's allegations that no banner was displayed and that none alerted Plaintiff are taken as true (FAC ¶¶ 17, 114), and an out-of-state image of a banner does not unambiguously contradict them.

Furthermore, consent must precede the interception, and on the FAC's allegations it could not. The Trackers fire "automatically upon page load and navigation," before any banner could be read or any choice exercised (FAC ¶¶ 8, 14, 181), such that the transmissions were complete before the user could act. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, 2022 U.S. App. LEXIS 14951, at *2-5 (9th Cir. May 31, 2022). Moreover, consent to a site's own collection does not authorize the separate third parties' interception. *Javier*, 649 F. Supp. 3d at 896-97 (N.D. Cal. 2023).

Plaintiff does not rely on matters outside the FAC to defeat this motion, which fails on the pleadings. The point is not that the relevant facts are unknown; it is that they are Defendant's. Plaintiff is prepared to establish that Defendant's consent-management platform is configured to withhold the cookie-consent banner from California visitors as a deliberate setting, while displaying it to users elsewhere, as in the out-of-state Figure 9. Video captures of guest-profile sessions on the Website from within California, recorded both contemporaneously with Plaintiff's visits and currently; Plaintiff's forensic audit of the Website; and Plaintiff's session HAR file each independently demonstrate that configuration. Should the Court consider Defendant's extrinsic consent materials, including its characterization of Figure 9, the Privacy & Terms, and/or the request-for-judicial-notice exhibits, Rule 12(d) entitles Plaintiff to present this evidence

and convert the motion to one for summary judgment; alternatively, Plaintiff requests leave to amend to allege these facts. Fed. R. Civ. P. 12(d), 15(a)(2)

In truth, Defendant's fallback does not rest on a banner at all; it rests on the Privacy & Terms hyperlink. Defendant argues that Plaintiff "must have been presented with Hobby Lobby's Privacy & Terms," which were "presented prominently at the bottom of the page upon entering the Website" (MTD at 9), and that he "agreed to" them "by continuing to use the Website" (MTD at 23). That is an effort to bootstrap a passive, non-blocking hyperlink into express prior consent, and it fails. A link a user need never see, open, or click is not consent: the FAC alleges that "[g]eneral statements in a privacy policy accessible only through non-blocking hyperlinks do not constitute express prior consent" (FAC ¶ 17), and that allegation is taken as true. Continued use of a website does not manufacture assent to terms the user was never required to view, still less the prior consent that interception under § 631 requires.

Nor can Defendant use judicial notice of its own Privacy & Terms to supply the consent it must prove; its declaration authenticates only those terms and a "Privacy Preference Center" reached by "clicking the 'Do Not Sell or Share My Personal Information' link" (Perry Decl. ¶¶ 2-5; RJN Exs. A-D), which is the opposite of a blocking consent gate. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1002-03 (9th Cir. 2018) (a court may notice that a document exists but may not judicially notice disputed facts within it, nor use incorporation-by-reference to resolve an issue in the defendant's favor against a well-pleaded complaint).

**4. PLAINTIFF PRESERVES THE FEDERAL WIRETAP ACT CLAIM (18 U.S.C. § 2511).**

Section 631 is Plaintiff's principal wiretap claim; Plaintiff separately preserves the federal Wiretap Act claim. The third parties are not parties to the communications; they are separate entities that surreptitiously acquire a duplicate of them. *In re Facebook*, 956 F.3d at 607-08. Under 18 U.S.C. § 2511(2)(d), a party's prior consent ordinarily authorizes a private interception unless the interception is undertaken for a criminal or

tortious purpose.

### 5. PLAINTIFF STATES CONSTITUTIONAL PRIVACY AND INTRUSION CLAIMS.

Whether conduct is "highly offensive" is a fact-intensive inquiry that courts are reluctant to resolve on the pleadings, particularly where the challenged conduct involves surreptitious tracking and profiling. *In re Facebook*, 956 F.3d at 605-06 (the question "cannot be resolved at the pleading stage"); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799 (N.D. Cal. 2022) ("Courts are generally hesitant to decide claims of this nature at the pleading stage"); *R.C. v. Sussex*, 2025 WL 948060, 2025 U.S. Dist. LEXIS 59491, at *28; *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1054 (N.D. Cal. 2018) ("a factual question 'best left for a jury'"). The offensiveness inquiry is context-dependent, not categorical: *Hammerling* found particular data collection not highly offensive, but it did so as to inferential device- and app-usage data the court held was not even content, not the plaintext religion-related search queries and product-content transmitted as discrete named parameters alleged here. *Hammerling*, 615 F. Supp. 3d at 1089-90, 1092-93 (such collection was "routine commercial behavior," not "highly offensive").

Plaintiff alleges a legally protected interest in the confidentiality of the contents of his communications reflecting religion-related interest, transmitted to and profiled by third parties, not merely routine metadata or identifier-level data. Defendant's argument that a product name containing a religious word is not "religious information" misframes the allegations. The sensitivity here does not turn on a product that incidentally bears a religious label; it turns on Plaintiff's own search queries "jesus" and "jesus saves," which express religious faith and conviction rather than a shopping preference and which the FAC describes as "reflecting religious interests and beliefs." (FAC ¶ 287.) Those queries, together with the religiously-themed product pages Plaintiff viewed, were transmitted off-site and linked to persistent identifiers. This Court applied the same content distinction in *Ji*, sustaining the privacy claims to the extent they were premised

on intercepted actual content while dismissing claims based only on "data about content." *Ji*, 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *28-29. See also *R.C. v. Sussex*, 2025 WL 948060, 2025 U.S. Dist. LEXIS 59491, at *28-30 (sustaining a California constitutional privacy claim based on the surreptitious transmission of sensitive communications and personally identifying information to a third party for marketing and other purposes). Plaintiff does not seek money damages under the California Constitution and does not oppose dismissal of any such prayer to that extent; he continues to seek declaratory and injunctive relief on that count.

**6. PLAINTIFF STATES A UCL CLAIM.**

Defendant's UCL attack fails under this Court's own decisions. Plaintiff's UCL claim proceeds under the "unfair" prong, tethered to the privacy protections embodied in CIPA and the California Constitution. This Court sustained precisely such a claim in *Sunga*, holding that allegations of conduct violating privacy protections established by the California Constitution, CIPA, and related statutes were sufficient under the UCL's tethering test. *Sunga v. NAVER Corp.*, No. 21-cv-05143-HSG, 2026 WL 1102870, 2026 U.S. Dist. LEXIS 90308, at *50-51 (N.D. Cal. Apr. 23, 2026). Because the FAC alleges conduct comparable to the CIPA and constitutional-privacy violations pleaded here, it states an unfair-prong claim under *Sunga*.

Plaintiff also adequately alleges UCL economic injury. The FAC alleges that browsing data has measurable economic value, that Defendant's unauthorized collection and disclosure deprived Plaintiff of control over that data, and that Defendant and the third parties commodified and monetized it. (FAC ¶¶ 124, 134, 174, 300-301.) These allegations describe an economic injury to Plaintiff, not merely a gain to Defendant.

*Briskin* rejected the asserted lack-of-injury argument after recognizing that courts have treated diminished value of personal information and a reduced right to exclude others from accessing it as forms of economic injury. *Briskin,* 2026 WL 161441, 2026 U.S. Dist. LEXIS 11317, at *25-26. *Ji* likewise sustained UCL standing based on allegations of a market for plaintiffs' data, diminished value, and impairment of their

ability to participate in that market. *Ji,* 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *29-30. *See also In re Facebook*, 956 F.3d at 600-01 (recognizing an economic stake in unjustly earned profits derived from personal data).

**7. PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT.**

Where a plaintiff pleads unjust enrichment, the claim may be construed as a quasi-contract claim and may be pleaded in the alternative. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015). In *Ji*, the Court stated that "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss," found the unjust enrichment claim adequately pleaded, and denied dismissal. *Ji*, 2023 WL 6466211, 2023 U.S. Dist. LEXIS 178311, at *40-41 (citing *In re Facebook*, 956 F.3d at 599). The FAC likewise alleges that Defendant received and monetized Plaintiff's data, unjustly retained the resulting benefit at Plaintiff's expense, and should be required to disgorge those gains. (FAC ¶¶ 312-317.)

**8. PLAINTIFF STATES A CLAIM UNDER CIPA § 638.51.**

Courts have recognized that tracking software can qualify as a "device or process" under § 638.50. *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023). Defendant's argument that capturing content defeats pen-register status fails because the FAC segregates the two categories at the data-element level: "no data element is pleaded as both DRAS Information and Communication Contents." (FAC ¶¶ 69-70.) The § 638.51 claim is limited to that separately-pleaded, non-content DRAS subset, while the content fields support the separate § 631 and § 2511 claims.

*Mitchener v. CuriosityStream, Inc.*, 815 F. Supp. 3d 845, 851-52 (N.D. Cal. 2025), held that a device capturing a communication's contents is not a trap-and-trace device, and that bare metadata alone works no privacy injury. Neither reaches this claim. The FAC pleads the § 638.51 count only as to the separately-segregated, non-content DRAS subset (FAC ¶¶ 69-70), and a multi-function process is not exempt merely because it also transmits content in separate fields. Plaintiff's standing on that count rests on his

content-neutral economic injury, not on a privacy interest in the DRAS.

## V. CONCLUSION

Plaintiff respectfully requests that the Court deny Defendant's MTD except as to the prayer for damages under the California Constitution, which Plaintiff does not oppose dismissing. If any allegation is deemed insufficiently pleaded, Plaintiff respectfully requests leave to amend under Rule 15(a)(2).

Respectfully submitted,

Dated: July 10, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: *<u>/s/ Ross C. Cornell</u>*

Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*